UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,          Case No. 21-cr-491

        Plaintiff,

                                   April 25, 2024
        vs.                        10:09 a.m.

PAUL SPIVAK,
OLGA SMIRNOVA,
CHARLES SCOTT,
CHRISTOPHER BONGIORNO,

        Defendants.


TRANSCRIPT OF MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE J. PHILIP CALABRESE

UNITED STATES DISTRICT JUDGE


Official Court Reporter:   Susan Trischan,RMR,CRR,FCRR,CRC
                           7-189 U.S. Court House
                           801 West Superior Avenue
                           Cleveland, Ohio    44113
                           (216) 357-7087

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

```
 1    APPEARANCES:

 2    For the Government:        Alexander Abreu, AUSA
                                 Office of the U.S. Attorney
 3                               Northern District of Ohio
                                 801 West Superior Avenue
 4                               400 U.S. Court House
                                 Cleveland, Ohio    44113
 5                               (216) 622-3600

 6    For Defendant Spivak:      David L. Axelrod, Esq.
                                 Lauren W. Engelmyer, Esq.
 7                               Ballard Spahr - Philadelphia
                                 51st Floor
 8                               1735 Market Street
                                 Philadelphia, PA    19103
 9
      For Defendant Smirnova:    John F. McCaffrey, Esq.
10                               Melissa Z. Kelly, Esq.
                                 Tucker Ellis
11                               Suite 1100
                                 950 Main Avenue
12                               Cleveland, Ohio    44113

13    For Defendant Scott:       David M. DeVillers, Esq.
                                 Barnes & Thornburg
14                               Suite 3300
                                 41 South High Street
15                               Columbus, Ohio    43215

16    For Defendant Bongiorno:   Michael J. Rosen, Esq.
                                 Law Office of Michael J. Rosen
17                               Suite 3400
                                 100 South East 2nd Street
18                               Miami, Florida    33131

19                                  - - - - -

20

21

22

23

24

25
```

1          THURSDAY, APRIL 25, 2024, 10:09 A.M.

2               THE COURT:  Please be seated.

3               Good morning.

4               We're on the record in Case Number

10:09:57  5    1:21-cr-491, the United States of America versus Paul

6    Spivak and others.

7               Counsel, will you please state your

8    appearances for the record?

9               MR. ABREU:  Good morning, Your Honor.

10:10:08 10               Assistant U.S. Attorney Alex Abreu for the

11   United States of America, and with me today is FBI

12   Special Agent Anthony Fry.

13               MR. AXELROD:  Good morning, Your Honor.

14               David Axelrod along with Lauren Engelmyer

10:10:23 15   on behalf of Paul Spivak.

16               MR. ROSEN:  Judge, good morning.

17               Michael Rosen on behalf of Christopher

18   Bongiorno.

19               MR. DeVILLERS:  Good morning, Your Honor.

20          David DeVillers on behalf of Charles Scott.

21               MR. McCAFFREY:  Your Honor, John McCaffrey

22   and Melissa Kelly on behalf of Olga Smirnova.

23               THE COURT:  Well, good morning.

24               We're scheduled today for oral arguments on

10:10:47 25   the various pending motions, which I am still very much

1    working through, so I look forward to hearing from all of

2    you to help me in those efforts.

3                   Let me start by telling you how I'm

4    thinking about the motions, which will also tell you how

10:11:09  5    structurally I think it makes sense to proceed this

6    morning.

7                   So as I see it -- and I'm speaking in broad

8    strokes here -- I know everyone's captioned their motions

9    technically differently so I'm not glossing over that,

10:11:26 10    and I know that will be significant and important as we

11    move forward.

12                   But as I see it, there's functionally three

13    groups of motions.

14                   There's Rule 12 motions, there's motions to

10:11:41 15    sever, and there's -- I suppose the last group would be

16    what I would call evidentiary motions.  I think those are

17    principally the motions to suppress that Mr. Bongiorno

18    filed.

19                   And I think that's roughly the order in

10:12:10 20    which I'm approaching them and thinking about them

21    structurally.

22                   Of any of the motions to dismiss, I know

23    that one -- I call them Rule 12 motions, but I know the

24    one is pre-indictment delay motions, so again I'm

10:12:25 25    speaking broadly here.

1          I know that if any of those are granted in

2     whole or in part they might have implications down the

3     line.

4          So what I'd like to do is take them in

10:12:36  5     those groupings, starting with the motions to dismiss,

6     and then moving on to the motions to sever, and then that

7     last group of motions, the evidentiary ones, last.

8          Again that's how I'm thinking about them

9     and working through them.

10:12:52 10          So with that, I'll just say one other thing

11     as a preface to apply to all of your remarks and

12     arguments.

13          You can either speak from counsel table in

14     which case please remain seated and speak directly into

10:13:10 15     the microphone, or speak at the podium.  Either way, just

16     be sure you're speaking into the microphone for the

17     benefit of our court reporter.

18          So with that, I'd like to turn to the

19     motions to dismiss, and perhaps, Mr. Axelrod, I'll start

10:13:29 20     with you.

21          MR. AXELROD:  Great.  Thank you, Your

22     Honor.

23          And I'll come up.  Old habits die hard.

24          THE COURT:  I understand.

10:13:35 25          MR. AXELROD:  And the way I think -- of

1    course, it's up to you -- but I think probably the way --

2    and we've talked about this -- the best way to structure

3    it is going sequentially through the motions.

4               So there's a motion to dismiss Count 1 and

10:13:50   5    the substantive counts related to Count 1.  There's a

6    motion to dismiss Count 2 and the substantive counts

7    related to Count 2.  And then there's the kind of, I

8    would call them, the obstruction counts like 48 and 50

9    that are at the end.

10:14:03  10               I'll be handling Count 1 and the

11   substantive counts, and then I think that Mr. McCaffrey

12   would like to weigh in after I do.

13               Ms. Engelmyer, who is a senior associate

14   working with me, will be handling Count 2, and then I'll

10:14:15  15   handle the other ones as well.

16               But, you know, I've done this a lot, Your

17   Honor, I'm not going to go chapter and verse through the

18   briefs because I know that you've read them so I'm going

19   to try to hit the high points, but of course if you have

10:14:27  20   any questions, I'm more than happy to answer those.

21               So we don't file these motions to dismiss

22   lightly.

23               And I understand the standard is generally

24   favorable to the Government and to what a grand jury

10:14:37  25   returns, but if you look at Count 1, it's a conspiracy to

1    commit securities fraud.

2              Conspiracy, of course, is its own criminal

3    act.  It's an agreement to do something criminal, but

4    that's the rub, right?  You've got maybe an agreement to

10:14:52 5    do something criminal.

6              If you're in agreement to trade stocks,

7    that's not criminal.  And so really that's where Count 1

8    falls apart.

9              Here, the offense purports that -- the

10:15:03 10    purpose of the conspiracy purports to be to commit

11    securities fraud, but the problem with Count 1 is it does

12    not articulate a theory of securities fraud like a

13    legitimate or articulable legally cognizable theory

14    against Paul Spivak or Olga Smirnova.

10:15:21 15              And it's really not hard to describe

16    securities fraud.

17              I mean, securities fraud indictments are

18    filed all over the country all the time, and they

19    generally rest on the idea that the defendants were

10:15:30 20    involved in the conspiracy to somehow mislead investors,

21    whether through false statements or some types of -- some

22    type of false signal or some type of market manipulation.

23              But this count fails to do all of that, any

24    of that, which suggests an evidentiary problem.  And I

10:15:46 25    think that the Government was creatively trying to get

1    around evidentiary holes in their case by structuring an

2    indictment that uses a lot of -- I'll use the term word

3    salad, but it's probably incorrect.

4             I mean, if you look at the indictment as I

5    did when I first came on the case, from afar it uses lots

6    of terms that sound in securities fraud.  There's a part

7    in the beginning that says pump and dump and then there's

8    a part about Rule 144 letters.  These are all common

9    phrases associated with securities fraud.

10            But when you actually drill down, Count 1

11   never actually says what the defendants, specifically

12   what my client Paul Spivak, did wrong and what his

13   knowledge was and what his intent was.

14            THE COURT:  Well, is it sufficient for the

15   grand jury to charge a conspiracy to violate federal

16   securities laws, and to leave the specifics of that to be

17   proved at trial?

18            I mean, I'm not aware of a specific

19   requirement.  I mean, it's not a 9(b) civil pleadings

20   standard, for example.

21            MR. AXELROD:  I certainly agree that it's

22   not a 9(b) and 9(b) does not apply here, but I do think

23   that there has to be an articulable theory, a legally

24   cognizable theory of securities fraud that has to be

25   alleged because otherwise, the grand jury returned an

1    indictment of conspiracy to do something that's legal,

2    which of course is not a crime.

3              THE COURT:  Well, so one of the things I've

4    been working through is whether -- so we talked about

10:17:15  5    Count 1, Count 2, and I think again in broad stroke

6    perhaps to shorthand it, it should be Count 1 and the

7    substantive related counts, Count 2 and the substantive

8    related counts.

9              So at some level does Count 1, to approach

10:17:33 10    your motion and your argument, require turning to the

11    substantive related counts first?

12              And if they charge a violation of federal

13    securities law, then the question becomes is there a

14    conspiracy that's charged?

10:17:47 15              MR. AXELROD:  I haven't looked at it that

16    way.  I haven't thought about it that way.

17              Generally, the way you see most

18    indictments, the way they're structured is you kind of

19    have Count 1 which sets out the overarching scheme,

10:18:00 20    right?  And then the substantive counts refer back to

21    that count and incorporate them.

22              I mean, I think the substantive counts are

23    all plainly infirmed in this case because if you look at

24    them -- and I'm kind of skipping now to the end of my

10:18:12 25    argument -- but if you look at them, I don't know -- and

1    I'm a practitioner of this, and I've been doing this for

2    15 years largely at the U.S. Attorney's Office in

3    Philadelphia and then at the SEC -- I can't tell what

4    Paul Spivak is alleged to have done to violate the

10:18:26    5    securities fraud statutes in the substantive counts,

6    which I'll get into by number, and in the wire fraud

7    counts that are attached.

8              But I think that problem is built really in

9    Count 1.  So let me jump and I'll give you an

10:18:39 10    explanation.

11              So Paragraph 9 talks about a pump and dump,

12    generally.  It just kind of lays out the groundwork for

13    what a pump and dump scheme is.

14              But Count 1 never alleges that the

10:18:52 15    defendants were actually engaged in a pump and dump

16    scheme.  It never alleges a pump.

17              So, you know, when we talk kind of commonly

18    about a pump, what we're talking about is people

19    generally releasing false information into the market to

10:19:06 20    pump up the stock, to raise up the stock price.

21              Usually that's on message boards on the

22    Internet or it's on Facebook or on Twitter or whatever

23    may have you, but the real key of that is that it's false

24    information.

10:19:18 25              Here, if you look at Paragraph 32, this is

1    really telling, it says Spivak and others --

2              THE COURT:  I'm sorry, which paragraph?

3              MR. AXELROD:  Paragraph 32.

4              THE COURT:  Thank you.

10:19:29  5    MR. AXELROD:  Of the superseding, second

6    superseding indictment.

7              Spivak specific -- Spivak and others

8    arranged to artificially inflate the prices of USLG

9    shares by creating and releasing favorable -- this is the

10:19:41  10   key -- favorable press releases.

11             Now, it is not illegal to release favorable

12   press releases.  If it were, every publicly traded

13   company in the United States would be indicted because

14   you know that anytime something good happens with

10:19:56  15   Twitter, Meta, whatever stock you may have, they issue a

16   press release because they want people to invest.

17             That's kind of the nature of our market.

18             Releasing favorable press releases is not

19   illegal.

10:20:11  20   It also, the problem with Count 1, is it

21   never alleges a dump.  Usually in a pump and dump scheme,

22   the people are holding all the stock, pump up the price,

23   sell it to unsuspecting investors, and then the people

24   holding the stock then dump the shares to make money.

10:20:26  25   Well, my client, if you look at the

1    indictment, is never accused of dumping any stock.  In

2    fact, he owns the majority of USLG, he has because he

3    founded the company, he's poured money into the company.

4    I think he owns like 50 million shares.  And he's never

5    alleged to have sold any of them but-for a small few.

6                     So there's no pump and there's no dump and

7    there's no falsity to drive up the price of the stock,

8    all right, so there's no pump and dump alleged.

9                     Now, of course, securities fraud can also

10   be premised on making misrepresentations to investors.

11   That's a common scheme you see where people go out and

12   they say, "If you invest in this company, the value of

13   the share is going to go up 200 percent in the next year"

14   or "We've got all these great things going on," and it's

15   all false.

16                     Here's also where Count 1 falls.  If you

17   look at Paragraph 29 of the second superseding indictment

18   it says Mallion and others made material

19   misrepresentations to investors.  Well, okay.  It does

20   not say Paul Spivak knew about that, encouraged it, was a

21   part of it, had any knowledge.

22                     THE COURT:  If he's a co-conspirator, that

23   is going to be imputed to him as an evidentiary matter,

24   isn't it?

25                     MR. AXELROD:  I don't -- I don't think so.

1           I mean, I think in most cases where you

2     have co-conspirators involved in a conspiracy, especially

3     one to commit securities fraud, it would say that Spivak

4     encouraged Mallion and others to make misrepresentations

10:21:52  5     to investors.

6           THE COURT:  Well, maybe if he's the kingpin

7     or what have you.

8           And I understand he's the first charged and

9     named defendant so maybe there's some inference or reason

10:22:03 10     to believe that's the case, but all of the actions of the

11     co-conspirators are generally, you know, charged to

12     another.

13           MR. AXELROD:  I think that that's right

14     because generally in a conspiracy allegation, it alleges

10:22:18 15     that the co-conspirators had knowledge or it was all

16     reasonable/foreseeable, those actions of the fellow

17     co-conspirators.

18           Here there is no such allegation.

19           And I don't think just because it's charged

10:22:31 20     as a conspiracy that you can infer all those actions of

21     some co-conspirators to another.

22           I mean, it's very easy if the evidence

23     supported it, it would be very easy for the Government to

24     say that Paul Spivak had knowledge or Paul Spivak

10:22:44 25     encouraged or Paul Spivak knew that it was reasonably

1    likely that these people would go out and make

2    misrepresentations to investors.

3                    It doesn't say that because I don't think

4    the evidence supports that.

10:22:55    5                    THE COURT:  Isn't that an inference from

6    some of the allegations where there's text messages and

7    conversations and things like that charged where the

8    focus is really on getting the stock price to certain

9    points, for example, to make payroll and things like

10:23:10   10    that?

11                    So isn't a logical consequence of that and

12    in the procedural posture the Government would be

13    entitled to a natural inference that Spivak intends the

14    consequences of that?

10:23:22   15                    He doesn't care how the price goes up or he

16    doesn't care how payroll is made; he just wants to make

17    sure that the capital is there, that the trades are

18    there, that the price goes up to allow that?

19                    MR. AXELROD:  I think that that is an

10:23:38   20    illogical leap based on what's in this indictment.

21                    I think there could be certain allegations

22    that would support that, but I don't think that those are

23    found in this indictment.

24                    I don't think that it follows that if

10:23:47   25    someone is interested in promoting the overall health of

1    their company, that it follows that they would be aware

2    or aware of or encouraging people selling stock to make

3    misrepresentations to investors.

4                    I mean, and I don't want to talk about the

10:24:02  5    evidence because I know that that's inappropriate.  That

6    will be done at a different time, so I'm really trying to

7    stick to the conspiracy.

8                    And really what my bugaboo is about this is

9    that if all what you say is true, Your Honor -- and it

10:24:15 10    very well could be -- it would be very easy to write that

11    in an indictment, that Mr. Spivak knew, Mr. Spivak

12    encouraged, Mr. Spivak was aware that this was going on.

13                    But all of that's missing from this

14    indictment.

10:24:29 15                    And because of that, I think -- and I'll

16    get to this in a second -- when you flow to the

17    substantive counts, the wire fraud and the securities

18    fraud counts which require knowledge, intent of the

19    specific acts, I think that's where really this, this

10:24:45 20    omission or this absence in Count 1 really becomes

21    exposed.

22                    But, you know, this is an indictment.  This

23    is a heavy speaking indictment.  There are over a hundred

24    specific overt acts that are discussed in Count 1, and

10:25:00 25    there's no allegations of knowledge of Spivak of any of

1    those misreps in any of those overt acts.  And I think

2    that that absence is as telling as what's actually in the

3    indictment.

4              Because if Mr. Spivak -- I mean, you know,

10:25:14  5    I'll take a step back.

6              There's actually no overt act that talks

7    about any of those misrepresentations specifically

8    either.

9              There's this general statement in

10:25:23  10    Paragraph 29 that, you know, Mallion made material

11    misrepresentations, but if on, for instance, December

12    13th of 2016 -- I'm making this up -- that Mr. Mallion

13    said to one investor, "USLG is going through the roof,

14    they're designing the space shuttle," right, obviously

10:25:39  15    that's insane, but if that were in the indictment, that

16    would be a very specific material misrepresentation.

17              But none of that's in the indictment

18    either.

19              And so really what it's trying to do, what

10:25:48  20    this indictment does is it talks in generalities about

21    things you generally find in a securities fraud

22    indictment without containing the specifics that I think

23    are required under the law to go forward with a

24    conspiracy of this type.

10:26:07  25              And I'll give you one other example.  So

1        one other common type of securities fraud is market

2        manipulation.  And now I'm not talking about --

3        necessarily about a pump and dump but, you know, maybe

4        match trades, painting the wire.

10:26:18    5                    And so if you look at Paragraph 24, there's

6        an allegation that says Mallion, Church and others used

7        manipulative stock trading techniques to artificially

8        inflate the share price of USLG.  That's Paragraph 24 of

9        the second superseding indictment.

10:26:34    10                    Again, you don't see any overt acts that

11       talk about this, but more importantly there's no

12       imputation of knowledge, encouragement, anticipation by

13       Spivak anywhere in the indictment.

14                    And so if this is a conspiracy to engage in

10:26:49    15       market manipulation like by sending false signals to

16       investors about volume, about interest, things of that

17       nature, there's nothing that shows that my client had

18       knowledge, participation, encouragement, reasonably

19       anticipated.  All of that is absent from Count 1.

10:27:05    20                    And it would be very easy, if the evidence

21       supported it, to include such an allegation.  And, you

22       know, again I'm not arguing the evidence, but I think

23       it's very clear that the omissions, the absences in this

24       count demonstrate that there is something underlying this

10:27:23    25       case about why those things could not be included in this

1    count.

2              And I think it's infirmed as it's written,

3    but I think there's an underlying evidentiary problem.

4              THE COURT:  And so one of your arguments is

10:27:37  5   that the Government has not charged kind of a particular

6    recognized theory of securities fraud, or maybe it's

7    mixing and matching and borrowing from both or from

8    multiple of them.

9              But is there a requirement in the law that

10:27:54 10   they charge one specifically?

11             MR. AXELROD:  Well, there is a requirement

12   that it -- that the crime alleged is specifically precise

13   that a client -- that a defendant could avoid double

14   jeopardy, right?

10:28:08 15            So, yes, I would say there is.  But I think

16   there's also --

17             THE COURT:  At some level from that

18   standard isn't the broader the allegation or charge, the

19   better for your client in the sense that it's notoriously

10:28:21 20   difficult to get convictions in white collar cases for a

21   host of reasons we don't need to go into -- I don't know

22   whether this is such a case or not -- but it seems to me

23   that if it is, that the broader the charge, I mean if the

24   charge is simply this is a 10b-5 violation as alleged,

10:28:37 25   then any conduct that falls within 10b-5 is going to be

1    barred.

2                      MR. AXELROD:  Yes.  I guess that's true.

3                      I think this is more of a problem for the

4    substantive counts, but I think that there also is a

10:28:49    5    legal requirement that -- like, I know that the

6    Government loves to say that, "An indictment is

7    sufficient as long as we restate the statute and the

8    elements in the statute."

9                      I mean, that's not -- that's not quite

10:29:00    10    true.

11                      And here, I don't think that this satisfies

12    the Rules.  And I'm thinking of the -- one second -- the

13    *Hamling* case that requires a statement of facts and

14    circumstances demonstrating what the count is.

10:29:14    15                      I don't think that it's sufficient under

16    *Hamling* and also the *Howard* case, which the Government

17    cites, to simply throw all these -- this word salad of

18    securities fraud terms in an indictment and then say,

19    "You go figure it out."

10:29:27    20                      I don't think that's sufficient under the

21    law.  I don't think that provides sufficient notice of

22    what the claim is, and I don't think it sufficiently

23    alleges a securities fraud violation.

24                      So that's kind of the crux of the Count 1,

10:29:41    25    and then I'll just move into the substantive counts if

1      you're ready for that.

2                    THE COURT:  Sure.

3                    MR. AXELROD:  So I mean, I think really the

4      problems with Count 1 -- the lack of specificity, the

10:29:52 5      lack of an overarching theory and the lack of allegations

6      of knowledge, engagement, anticipation -- all those

7      things really come out when you look at the substantive

8      counts.

9                    When you look at the securities fraud

10:30:06 10     counts and the wire fraud counts, it is impossible for a

11     practitioner like me to determine what the Government

12     actually alleges is illegal.

13                   And so -- I'm just grabbing my indictment.

14     So Count 5, for instance, let's go to Page 35 of the

10:30:25 15     second superseding indictment -- the pincite is 1443 --

16     Count 5 just lists October 14th, 2016, 20,000 shares,

17     defendant charged Spivak, proceeds of sale $5,000.

18                   And this actually cross-references to Count

19     1 in Paragraph 41-ff, and that is on Page -- I actually

10:30:55 20     forgot to write down the page, but it is on Page --

21                   THE COURT:  I believe it's Page 11 of the

22     second superseding indictment.

23                   MR. AXELROD:  Okay.  Thank you, Your Honor.

24                   No, 41-ff is --

10:31:07 25                   THE COURT:  Oh, yeah.  No, it's not.

1          I apologize.

2          MR. AXELROD:  No worries.

3          It's Page 18.

4          And (ff) says that, "On or about October

10:31:17  5  13th, 2016, Arthur and Bongiorno caused Victim 5 to send

6   a check for $5,000 to USLG account," blah, blah, blah,

7   "for the purchase of USLG shares."

8          There's nothing to do with Spivak in that

9   overt act.

10:31:33 10          And then if you go and you look at the

11  securities fraud alleged on Page 35, it says Spivak

12  committed securities fraud and repeats the statute above,

13  but there's no -- you're left guessing what Paul Spivak

14  actually did to commit securities fraud with respect to

10:31:48 15  Count 5.

16          I mean, you can cross-reference and go back

17  and look, but it doesn't say what Arthur and Bongiorno

18  did either.  Did they engage in a pump and dump to get

19  this investor to invest?  Did they lie to him about the

10:32:00 20  stock?

21          THE COURT:  Well, it sounds like the

22  allegation is that the investor was defrauded as part of

23  the conspiracy.

24          So I kind of go back to isn't the

10:32:10 25  conspiracy charge -- you know, doesn't that suffice to

1   sweep that alleged misconduct in?

2               MR. AXELROD:  I don't -- I don't think so

3   because, I mean, to be guilty of securities fraud, you

4   have to have knowledge and intent.

5               It does not anywhere in this indictment

6   state specifically on Page 35 what Spivak had knowledge

7   of, what he intended to do.

8               And then if you cross-reference it back to

9   Count 1, that's also missing there.

10              It does not indicate what was illegal.  It

11  does not state Spivak's knowledge.  I mean, you're just

12  left guessing and I'm still guessing.  I don't know.

13  I've looked at discovery.  I've looked at this indictment

14  a million times.  I don't know.

15              I mean, I'm guessing that I won't know

16  until trial, and to me that's a problem with the

17  indictment.  A criminal defendant should not be left

18  guessing.

19              THE COURT:  Well, isn't that more of a

20  problem with the criminal justice system at large?

21              I mean, I can tell you any number of cases

22  where defense lawyers have told me they didn't know what

23  the theory of the prosecution was until the key witness

24  took the stand.

25              I would say it shouldn't be that way.

1    That's why we have discovery in civil cases.  I don't

2    know why we don't have depositions and so forth in

3    criminal cases.  That's a different problem we're not

4    going to solve today.

10:33:36  5             MR. AXELROD:  I agree, and I'm not -- I do

6    think it is a problem, but I'm not attacking the criminal

7    justice system at large because I think in most cases --

8    take a drug case.

9             THE COURT:  It's okay if you do, but we're

10:33:47 10   just not going to solve that today.

11             MR. AXELROD:  Yeah, but I recognize I'm

12   talking to a Judge and not a Congressman or a Senator or

13   the President, so I'm appealing to the person I'm

14   speaking to.

10:33:57 15             But if you're talking about a drug case or

16   a gun case or a threats case, right, you allege a date

17   and place, that's sufficient, right?

18             When you're talking about securities fraud

19   where you're dealing with an incredibly broad statute, I

10:34:09 20   think it behooves Federal Judges in your position to help

21   defendants out.

22             I think the law requires it.

23             And I know that some Judges aren't --

24             THE COURT:  It's not clear to me from that

10:34:17 25   standard what more specificity you want.

1          You have a Victim 5, so presumably you have

2     some ability to make an identification on that, but even

3     if you don't, you have a specific date, financial

4     institution, and so forth.

10:34:31  5          I'm not sure what else can be -- you have a

6     number of shares and so on.

7          MR. AXELROD:  Well, yes, you have a victim,

8     you have a date.  But what's the fraud is really my

9     problem.

10:34:43 10          Well, if he was lied to, what was the lie?

11     If my client knew about it, say my client knew about it,

12     but this indictment doesn't say that.

13          And I do think that there is a requirement

14     in the law, if you look at the cases, for the Government

10:34:58 15     to say what the fraud was.  And I don't know why this

16     indictment doesn't do so.

17          And I think that this problem gets even

18     worse when you look at the other securities fraud counts

19     that aren't even cross-referenced in the indictment.

10:35:11 20          So if you look at Counts 6 through 12 and

21     18 through 19, there is no cross-reference to any of the

22     100 overt acts in the indictment.

23          I have no idea what those are premised on

24     besides someone investing.  Don't know who talked to

10:35:33 25     them, don't know why they invested, don't know what the

1        alleged theory of those, those crimes are.

2                    I mean, we really are left guessing, but

3        again forget guessing.  This indictment does not allege

4        that Spivak had knowledge, intent with respect to those,

10:35:50  5        those instances.

6                    I mean, it says it generally when it

7        repeats the statutory language, but it wouldn't be hard

8        for an indictment -- and I don't think this is asking

9        more than what the law requires -- for the indictment to

10:36:01 10        say that on September 16th, for instance, of 2016, this

11        person misrepresented something to Investor A and Spivak

12        knew about it.

13                    THE COURT:  But you're not asking for any

14        more specificity with respect to the particular kinds of

10:36:18 15        crimes charged in the second superseding indictment than

16        any other criminal charge generally.

17                    MR. AXELROD:  No.  No.

18                    Just want to know --

19                    THE COURT:  You're not -- you're not saying

10:36:30 20        there's a 95 Reform Act for securities fraud on the

21        criminal side as well is all I'm trying to get at.

22                    MR. AXELROD:  Correct.  That is absolutely

23        right.  I'm not -- I'm not saying that.

24                    I'm just saying that this does not meet the

10:36:42 25        standards that are required to give due notice to a

1    defendant of what he's been charged with.

2              Is there a tissue, Your Honor?  Thank you

3    very much.

4              And the problem with this is I do think

10:37:03  5    there's a double jeopardy issue with these substantive

6    counts, right?

7              Because let's say there's no statute of

8    limitations issue, let's be hypothetical here, but let's

9    say with Count 5 that the Government went to trial and

10:37:17 10    their theory with respect to Count 5 was that Arthur,

11    this person Arthur lied to this investor and that

12    investor invested.

13              Okay, jury comes back not guilty.

14              There's nothing preventing the Government,

10:37:30 15    based on this substantive count, from coming forward and

16    saying, "Okay, we're kidding, he actually invested

17    because of the pump and dump scheme because he was misled

18    based on what he read on the Internet."

19              There's nothing in this that I think would

10:37:43 20    prevent that argument from going forward.

21              THE COURT:  I'm not -- I mean, I understand

22    your argument.  I'm not sure I agree with that given the

23    way the Government has charged it.

24              I mean, I think charging the 10b-5 is going

10:37:54 25    to broadly encompass the various theories that the

1    Government has, you know, not in your view alleged.

2              So I think they would be, you know, bound

3    or precluded under each of them, especially with a

4    general verdict.

5              MR. AXELROD:  Okay.  But there's -- I mean,

6    there's a second problem, too, that I have not raised,

7    but I thought about last night.

8              Because of how broad this is, and because I

9    think it's insufficient, the grand jury may have indicted

10   Count 5 based on the notion that this investor was misled

11   in a verbal or oral conversation.

12             But at trial, the Government could

13   say -- could decide that maybe the evidence isn't great

14   on that point any more, and could shift its focus to a

15   market manipulation theory.

16             I think that would be an unlawful,

17   unconstitutional variance from what the -- from what the

18   grand jury indicted, and I think that because of the lack

19   of specificity in the indictment, we're really opening up

20   the possibility of error.

21             Now, largely my arguments about substantive

22   wire fraud are the same.  For wire fraud, the Government

23   must prove the defendant said something false.  It's

24   impossible for me to determine, with the wire fraud

25   counts, what Mr. Spivak is alleged to have done to commit

1      wire fraud, really in all of the counts.

2                     And there's another problem, and I know

3      that we argued about this in our initial brief.  It

4      appears -- but I don't know again because the indictment

10:39:22   5      doesn't say so -- that a portion of the Government's

6      theory is this idea of undisclosed broker payments; that

7      there was an omission by brokers, that they did not tell

8      investors that there would be broker commissions.

9                     And if you look at the wire fraud counts,

10:39:37  10      I'll throw one out at you -- well, I won't throw one out

11      at you; I'll just tell you -- it looks like there's a

12      number of wire fraud counts that allege a commission

13      payment going to a broker for bringing in a share of

14      stock, a sale of stock.

10:39:56  15                     We submitted cases -- there's the Skelly

16      case out of New York and actually the case the Government

17      submitted out of the Ninth Circuit is aligned -- an

18      omission is not a fraud unless there's a fiduciary duty

19      or a duty to speak.

10:40:10  20                     With the relationship between the brokers

21      alleged in this indictment and the investors, there is no

22      fiduciary duty so there, I mean --

23                     THE COURT:  There is a line of cases, at

24      least on the civil side -- I haven't had a chance yet to

10:40:23  25      run it down on the criminal side of securities fraud --

1   that that might be true unless and until you open your

2   mouth and speak, at which point you have a duty to

3   disclose all material information.

4                   So I mean, does that line of cases come

10:40:37 5   into play on the criminal side?

6                   MR. AXELROD:  I mean, I think it does,

7   right?

8                   An omission -- a material omission can make

9   an overt statement false, right?

10:40:48 10                   So hypothetically, if one of these brokers

11   said -- well, this would be an outright lie, but if one

12   of these brokers said that there's no commission

13   payments, right, then the omission that there was would

14   be false.

10:41:02 15                   But here there's no such allegation in the

16   indictment.  So you are correct, Your Honor, about that

17   line of cases, but I don't think that even comes into

18   play because there's no allegation that there was any

19   duty to speak here because of what was said.

10:41:13 20                   THE COURT:  And I should ask this.

21                   I have not had a chance to keep up with

22   news this week.  I believe the Supreme Court decided an

23   omission case this week.

24                   Does that have any -- first of all, is that

10:41:24 25   right?  And second of all, if so, does it have any

1     bearing on this?

2                    MR. AXELROD:  Your Honor, I was in trial

3     the last two weeks in Arizona.

4                    THE COURT:  So you're in the same boat I

10:41:33  5     am.

6                    MR. AXELROD:  Unfortunately, I am.

7                    THE COURT:  Okay.

8                    MR. AXELROD:  And we talked about, but I

9     just haven't had a chance to look at it.

10:41:38 10                    THE COURT:  I have not either.

11                    MR. AXELROD:  I don't think that Supreme

12     Court case is a significant shift in the law, but I'm

13     ignorant so I'll be quiet about that now.

14                    THE COURT:  Okay.

10:41:45 15                    MR. AXELROD:  But because of this, this

16     broker issue, I mean if, if that is what the Government's

17     theory is with respect to the wire fraud and the

18     securities fraud cases, then I think that there's another

19     significant issue that I haven't touched on yet that the

10:42:02 20     grand jury was not accurately or adequately advised of

21     the law regarding the Government's theory.

22                    And --

23                    THE COURT:  And so that's the issue on

24     which you're seeking the disclosure under Rule 6 of the

10:42:15 25     instruction?

1              MR. AXELROD:  Partially.

2              Primarily we're seeking that with respect

3      to the Count 2 and the entrapment instruction.

4              But what worries me more about this is that

10:42:26  5      because of the lack of, I think, sufficiency of the

6      indictment, we can't tell what the Government's theory

7      is, so it's possible that the grand jury was adequately

8      instructed, but it's possible they weren't.

9              We just can't tell.

10:42:41 10              And again, you run into issues of variance.

11      You run into issues of improper instructions.  And this

12      all flows from the fact that it is not difficult to

13      construct an indictment that actually says what the

14      allegations are and what the theory is.

10:42:55 15              And for some reason this is -- this

16      indictment, I think, is intentionally vague and

17      intentionally lacking in specifics I think because the

18      facts don't support it, but it really does cause a huge

19      notice problem and creates all types of ancillary legal

10:43:10 20      problems for my client.

21              That's it.

22              THE COURT:  All right.  Thank you.

23              Why don't we stick with Count 1 before

24      turning to Count 2?

10:43:19 25              So if there's anyone else who, on the

1    defense side, who wants to argue on Count 1.

2                      MR. McCAFFREY:  Good morning, Your Honor.

3                      John McCaffrey on behalf of Olga Smirnova.

4                      As the Court is aware, Ms. Smirnova is only

10:43:47  5    charged in two counts in this indictment, Count 1 and

6    Count 2, both conspiracy counts.

7                      I'm going to focus on Count 1 right now,

8    Your Honor.

9                      Count 1 covers a four-year time period from

10:44:01 10    2016 through 2019.  And as this Court is well-aware,

11    conspiracy is an inchoate offense which requires facts

12    from the Government demonstrating a specific intent of a

13    specific defendant to commit an offense, to enter into an

14    agreement to commit an offense.

10:44:22 15                      I echo -- and Ms. Smirnova is not charged

16    in any of the substantive securities fraud counts that

17    accompany Count 1.  I echo Mr. Axelrod's issue that there

18    is insufficient notice being given to Ms. -- to his

19    client, but even more so to Ms. Smirnova who is only

10:44:43 20    charged with a conspiracy.

21                      I, again, I can't tell what the theory of

22    the prosecution is, and I think the biggest issue here is

23    what was -- what was the explanation that was given to

24    the grand jurors as to what it was that Ms. Smirnova was

10:45:03 25    agreeing to enter into.

1          What was the nature of the theory of the

2     securities fraud that she was agreeing to, you know,

3     enter into an agreement to advance the commission of

4     those offenses?

10:45:19  5          There is no notice as to any specific

6     statements or conduct constituting the formation of the

7     agreement that involved Ms. Smirnova.

8          The mere fact of being married to one of

9     the defendants, the mere fact of working at the same

10:45:39 10    company as one of the defendants, as this Court knows, is

11    wholly insufficient.

12         There's no facts demonstrating that she

13    engaged in any specific conduct demonstrating her

14    knowledge of a specific securities fraud scheme.

10:46:00 15         And I want to just quickly point out to the

16    Court why this is problematic for the Government, and I

17    want to direct the Court to a series of overt acts that

18    are alleged in Count 41.

19         The Count 41, as it relates to

10:46:20 20    Ms. Smirnova, identifies only ten text messages involving

21    communications which the Government alleges establish

22    Ms. Smirnova's knowledge of the specific object and

23    purpose of the conspiracy.

24         Six of those ten text messages include

10:46:42 25    exchanges with several other individuals, and

1    Ms. Smirnova happens to be one of the people that is

2    included on the text.

3                         And the six text messages -- six of those

4    text messages all occur in a fairly tight time frame in

10:47:03  5    September of 2016, and then the sixth text message is in

6    November of 2016.

7                         This is a four-year conspiracy, Your Honor.

8    And these are these six text messages that don't show

9    that she saw or read the text message, that she acted on

10:47:21 10   the text message, that she had an understanding of the

11   subject matter that was being discussed in the text

12   message, or that she engaged in any conduct before or

13   after showing some form of knowledge.

14                        I mean, I -- I think the Court can take

10:47:37 15   judicial notice of, you know, just because you're

16   included on a text message does not necessarily mean that

17   you read it or understood what was -- what was being

18   discussed.

19                        THE COURT:  From a charging standpoint,

10:47:51 20   though, isn't that a fact question to be argued to a

21   jury?

22                        MR. McCAFFREY:  It is, but I think that

23   from the stage that we're at right now, the Government

24   has to at least establish what the evidence is that she

10:48:05 25   entered into a conspiratorial agreement.

1           Just because she's on a text message does

2     not establish that basic requirement.

3           I want to talk about -- so I talked about

4     the six text messages of the ten that just include her on

10:48:23  5     it.  There's four text messages in Paragraph 41 where she

6     does have communications and does respond.

7           All of those, each of those four text

8     messages is with a specific individual that's Laura Lesh

9     who was the Vice President of Finance and Administration.

10:48:45  10    She's a woman that is very knowledgeable about

11    securities.  She's got a -- she has a Series 7 license, a

12    Series 52 and a 63 license.

13          THE COURT:  Isn't Ms. Smirnova during this

14    time the Chief Operating Officer, or do I have that

10:49:00  15    wrong?

16          MR. McCAFFREY:  She's -- I don't know that

17    she's the Chief Operating Officer.

18          She is essentially a purchasing agent at

19    this time.

10:49:07  20          THE COURT:  She's a senior executive,

21    however you cut it.

22          MR. McCAFFREY:  I mean, she is -- yeah, I

23    mean she's, I guess, as senior as you can be in a small

24    company like USLG.

10:49:21  25          But the first text message, Paragraph 41-xx

1    occurs on April 12th, and it's a text message mentioning

2    Mr. Mallion and USLG shares, and they're talking about

3    how they are going to see Richard on Friday.

4              Well, Your Honor, and again we raise in, I

10:49:49  5    think, in particular with respect to Count 2 the issue of

6    context and how was this, how was this portrayed to the

7    jury.

8              What's going on is April -- April 12th is

9    there's a proceeding coming up.  There's a proceeding

10:50:02 10    that was filed in Lake County where Mr. Mallion was sued,

11    and this relates to the fact that they're going to see

12    him, and apparently he has a proposal connected with that

13    lawsuit.

14              That has nothing to do with the securities

10:50:16 15    fraud conspiracy.

16              The second text --

17              THE COURT:  I mean, I guess as I look at

18    the text message, I mean, I take the point that it's out

19    of context.

10:50:25 20              MR. McCAFFREY:  Yes.

21              THE COURT:  And I mean, that ultimately

22    seems to be a fact question; not a -- not a question of

23    sufficiency of the indictment under the governing

24    standard.

10:50:35 25              MR. McCAFFREY:  I think it's a -- I think

1    it goes to how was this explained to the grand jury in

2    the context of this defendant, Ms. Smirnova, is involved

3    in a -- she entered into an agreement to violate

4    securities fraud.

10:50:50  5                     THE COURT:  Well, I mean, apparently the

6    grand jury believed that there was probable cause that

7    the proposal was not what you're arguing but a proposal

8    for a coordinated activity to manipulate the stock price

9    for the purpose under 10b-5 of defrauding investors or

10:51:05  10    manipulating the market.

11                     MR. McCAFFREY:  I submit, Your Honor, I

12    don't know that they had any understanding of it.

13                     But let's go to the next two text messages,

14    which both occur in October 23rd, 2017 and involve an

10:51:19  15    exchange again with Laura Lesh.

16                     And the first one, Paragraph 41-ddd, this

17    is talking about information from DTC.

18                     Your Honor, that refers -- DTC eligibility

19    is essentially a depository --

10:51:38  20                     THE COURT:  Right.

21                     MR. McCAFFREY:  -- and is trying to

22    determine whether or not they can check with DTC to

23    determine whether or not they can see who it is that is

24    essentially trading or trading in these securities, and

10:51:54  25    that gets to the NOBO designation which is the

1    Non-Objecting Beneficial Owner.

2              If that particular owner doesn't object to

3    being disclosed on the DTC depository, then you could

4    find out who it is, but Laura Lesh --

5              THE COURT:  I mean, it sounds like -- I

6    mean, I think what Mr. Abreu would say, I'm not

7    saying -- I mean, this is a fact question ultimately it

8    seems to me, but it sounds like one plausible

9    interpretation of that is that it's enforcement activity

10    where Ms. Smirnova, at the direction of Mr. Spivak or

11    others in a conspiracy, are trying to figure out who's

12    acting at cross-purposes.

13              MR. McCAFFREY:  But how does -- how is

14    that, Your Honor, conduct demonstrating her specific

15    intent to enter into a conspiracy to violate the

16    securities statutes?

17              That's what I'm getting at is where is the

18    proof of the specific intent?

19              The only way I can divine that is through

20    looking at the specific overt acts alleged.

21              And I'll go to the last one, Your Honor,

22    because I think this is -- this is really a very

23    important one when we talk about context, and that's

24    Paragraph 41-eee -- I'm sorry -- 41-ttt, which is on

25    April 12th of 2018.

1         And it's talking about Ms. Lesh says that

2    she has sold her USLG shares, and Ms. Smirnova says, "I'm

3    glad you did it."

4         What's not explained is Ms. Lesh left in

10:53:39  5    November of 2017.  There are a series of many e-mails

6    between these two.  They stayed in touch.  They both had

7    babies at the same time.

8         And it just so happens this, this

9    conversation with this reference occurs ten days after

10:54:04 10    Ms. Lesh had already sold her 25 units of USLG shares

11    that she was granted back in 2016 as part of her package.

12    She was granted these shares as part of her employment

13    package.

14         And, I mean, what would you expect?  "Oh,

10:54:23 15    good for you, I'm glad you did, it's already done," but

16    none of that context is presented here.

17         It's offered to the grand jury as just raw

18    meat to this is evidence of specific intent to enter into

19    a conspiracy.

10:54:41 20         And importantly, there are, and the

21    Government produced in discovery, there are many texts

22    between the time that Ms. Lesh left USLG in November of

23    2017 up through this conversation in April of 2018.

24    There is no discussion about USLG shares, there's no

10:55:07 25    discussion whatsoever.  If there was, you'd surely see it

1    here, but there's nothing.

2                    This is completely taken out of context.

3                    So, Your Honor, I go back again to the

4    sufficiency of the evidence as it relates to this

10:55:23  5    particular defendant, Ms. Smirnova's specific intent to

6    enter into a conspiracy.

7                    There is nothing in the overt acts that

8    demonstrates that she entered into a conspiracy to

9    violate the securities laws.

10:55:35 10                    Thank you.

11                    THE COURT:  All right.  Were you getting up

12   a moment ago, Mr. Rosen, on Count 1?

13                    MR. ROSEN:  May I, Your Honor?

14                    THE COURT:  Yes.

10:55:54 15                    MR. DeVILLERS:  Just briefly, there's a

16   couple things I want to point out, that my client

17   Mr. Scott in Count 1 is that there's these general

18   allegations in the first paragraph of Count 1, and then

19   every overt act after that with my client is just

10:56:09 20   buying/selling stock and wiring money.

21                    Nowhere in there does it talk about any

22   sort of material misrepresentation or knowledge of

23   material misrepresentation to stockholders or to would-be

24   stockholders.

10:56:25 25                    THE COURT:  There was some allegations in

1    the second superseding indictment, at least two that I

2    remember, that the last trade of the day was specifically

3    made to raise the stock price from, you know, whatever,

4    from 18 cents to 29 cents, or whatever the case may be.

10:56:41  5              Was that -- were those allegations

6    involving transactions that Mr. Scott was involved in?

7                   I just don't recall that specifically.

8              MR. DeVILLERS:  I don't believe they were.

9              That was 2016.

10:57:01  10            MR. AXELROD:  Yeah.  Those allegations

11   relate to Church; not Scott.

12            MR. DeVILLERS:  Yes.  Yes.

13            THE COURT:  Fair enough.  Yes.

14            That's -- thank you.  That's the question I

10:57:10  15   was trying to ask, which defendant was charged or

16   implicated in those trades.

17            MR. DeVILLERS:  Yeah, the trades that are

18   referred to here --

19            THE COURT:  And the fact that you're

10:57:20  20   struggling in response to my question suggests that it

21   was not Mr. Scott.

22            MR. DeVILLERS:  Yes.

23            There are --

24            THE COURT:  I suspect you would have it at

10:57:27  25   your fingertips if it were.

1          MR. DeVILLERS:  Yes.  I understand, Your

2     Honor.

3          So buying and selling stock, there's no

4     indication, other than the general first paragraph saying

10:57:34  5     he knew about this scheme to misrepresent the purchases

6     of stock.

7          Do you have any questions from me, Judge?

8          THE COURT:  All right.  No, that was my

9     primary one.

10:57:49 10          Thank you.

11          MR. ROSEN:  Good morning, Your Honor.

12          May I be the first to nominate you to the

13     Federal Judicial Rules Committee so we can impose some

14     depositions?

10:58:02 15          THE COURT:  I don't know what I've done to

16     offend you to put me in that position so.

17          MR. ROSEN:  Caught my attention is what you

18     did.

19          Judge, the case that you were referring to,

10:58:11 20     I'm going to spell it, it's Macquarie, the Supreme Court

21     case that just came out this week, it's Macquarie

22     Infrastructure, M-A-C-Q-U-A-R-I-E, versus Moab, M-O-A-B,

23     and it was a couple weeks ago, April 12th, 2024.

24          THE COURT:  I guess I've been busier longer

10:58:31 25     than I thought.  I would have thought it was at the end

1    of last week or the beginning of this week, so I'm really

2    falling behind.

3                My apologies.

4                MR. ROSEN:  No.  No.  No.

10:58:38  5                It does discuss 10b-5 and it does discuss

6    fraud and it does discuss the fact -- actually it's a

7    unanimous decision which really --

8                THE COURT:  I think that was a civil case,

9    wasn't it?

10:58:49  10                MR. ROSEN:  It was a civil case, that's

11    correct.

12                And it speaks to a defendant, in this case

13    a company, cannot be guilty of fraud where they failed to

14    speak if they had no duty to speak.

10:59:00  15                And so in --

16                THE COURT:  I mean, it caught my attention

17    earlier in discussing with Mr. Axelrod because of the

18    brokerage commission point.

19                MR. ROSEN:  Correct.  I agree.

10:59:16  20                And I do think that it may have some

21    application here.  I'm not sure to a motion to dismiss,

22    but I read it so it caught my attention as to the

23    application in this case, albeit a civil case.

24                THE COURT:  The issue occurred to me, and I

10:59:28  25    said I have to read that before today, and here we are.

```
 1              MR. ROSEN:  Now you don't.

 2              THE COURT:  Well, now I have to read it

 3    after today.

 4              MR. ROSEN:  Your Honor, the only thing I'm

 5    going to add to any of this is that I have a pending

 6    motion to adopt these arguments.

 7              THE COURT:  Yes.  Yes.

 8              MR. ROSEN:  And I just to want make sure

 9    the Court grants it so I've got an argument to be -- to

10    be a part of this.  I'm not going to --

11              THE COURT:  Yeah, I'll give you the spoiler

12    alert now.

13              I'm going to grant all of those motions

14    just so that everyone's record is preserved.

15              MR. ROSEN:  I'll stop talking.

16              Thanks, Judge.

17              THE COURT:  Fair enough.

18              All right.  On Count 1, Mr. Abreu, any

19    response on your part?

20              MR. ABREU:  Just briefly, Your Honor.

21              Your Honor, I think our response in

22    opposition covers most of what the defendants have argued

23    today and what they've written, and basically my point

24    and my argument is that the defendants would like to

25    expand the requirements that -- of what is sufficient to
```

1    plead a criminal charge in a criminal case.

2                    This is not a civil case.  As the Court

3    knows, this, on a 371 conspiracy, so for Count 1 and

4    Count 2, the Government was -- needs to prove one overt

11:00:54  5    act.

6                    I have to allege one overt act, and we

7    alleged over a hundred.

8                    THE COURT:  On the part of any

9    co-conspirator.

11:01:02 10                    MR. ABREU:  On the part of any

11    co-conspirator; not every co-conspirator.

12                    The Government does not need to put in

13    specific factual allegations and specifically say that a

14    specific conspirator knew exactly what this other person

11:01:17 15    was doing to -- for that person to be guilty or for that

16    person to be charged.

17                    THE COURT:  I think, as I read through the

18    briefs that the defendants have filed and as I listen to

19    their arguments today, I think I primarily have two, two

11:01:34 20    concerns that I struggle with or -- and I'm still working

21    through, as you can tell.

22                    One is whether -- because I've seen this in

23    other cases -- one is whether the grand jury is

24    approaching a very -- a fact pattern that's not one with

11:02:02 25    which you deal every day as a layperson.  Right?

1        This is not necessarily -- it's more, more

2   in the nature of regulatory *Mallum Prohibitum* than *Mallum*

3   *In Se* , although, you know, depending on the nature of

4   the fraud -- and I get that there's some allegations here

11:02:20   5   that that could be taken to a level of *Mallum In Se*, but

6   let's set that to the side.

7        So in a complex set of financial

8   transactions that a grand jury is not day-in and day-out

9   going to be familiar with from their everyday lives, I

11:02:38  10  have some concern that -- and Mr. Axelrod spoke a bit to

11  this -- but, you know, the concern is just is this

12  conduct unseemly but not illegal, and is the grand jury

13  returning indictments for wholly legal, if -- you know,

14  you don't want to look too hard at the sausage-making

11:03:02  15  sometimes, but, you know, are they charging the violation

16  of a criminal law based on perfectly legal conduct?

17        MR. ABREU:  So, Your Honor, I think the

18  best response to that is to look at the elements of

19  securities fraud, the way it's charged.

11:03:19  20        And the first element is that the defendant

21  knowingly, either employed a -- basically a scheme or

22  made any untrue statement or omitted a material fact

23  necessary to make the statement made true during the

24  course of the sale of a security, in connection with a

11:03:41  25  purchase of a security that used interstate commerce, and

1    acted with the intent to defraud.

2              So really it's the intent to defraud and a

3    false statement.

4              Grand juries deal with that all the time.

11:03:55 5    That is the bread and butter of fraud.

6              At the very beginning, Mr. Axelrod's

7    argument makes it appear that there's only three types of

8    ways that you can commit securities fraud.  That's

9    absolutely wrong.

11:04:09 10             There's infinite ways to commit securities

11   fraud.  It just has to have a lie with an intent to

12   defraud in connection with the purchase of a security.

13   That's really what you need.  That's what 10b-5 requires

14   and that is what fraud requires.  That's what's required

11:04:28 15   for wire fraud, bank fraud.

16             The difference between all of those crimes

17   are usually one element related to here it was in

18   connection with the purchase or sale of a security.

19             In bank fraud, it's that it was to obtain

11:04:44 20   bank property or affected a bank.

21             In wire fraud, it's that you used a wire.

22             In mail fraud, it's that you needed a

23   mailing.

24             All the same requirements in terms of

11:04:54 25   falsity.

1           So I don't think that this is particularly

2      hard for a grand jury to grasp because as soon as you say

3      fraud, what you're really talking about is there a lie

4      and did the person act with the intent to defraud.

5           THE COURT:  Well, I guess part of that and

6      some of the concerns that the defendants are raising is

7      that there's some cherry-picking going on, there's

8      certain statements that are being taken out of context

9      and, you know, if you look at one line of a text message

10     it sounds pretty bad, but if you put it into a broader

11     context.

12           So I mean, what's ultimately the way to

13     police that?

14           Do you have to impanel a jury?  I mean,

15     that's an awfully heavy burden for any defendant.

16           MR. ABREU:  Your Honor, to police

17     cherry-picking in terms of an indictment and what

18     language the Government chooses to put in the indictment,

19     Your Honor, the grand jury has a fair amount of latitude

20     to consider what it considers.  It's done in secrecy.

21           And unless the defendants meet the high bar

22     of actually showing that there is some irregularity, not

23     just some "We don't know what the grand jury did because

24     we don't like the way that this is alleged so give us the

25     grand jury transcripts," Courts see that all the time and

1   reject those arguments because the grand jury is afforded

2   that deference to conduct and exercise its role to find

3   that there's probable cause and to determine who to

4   charge and who not to charge.

11:06:31  5   Your Honor, the -- whether -- what's in the

6   indictment is policed by the Court ultimately.

7   I haven't had a trial with you yet, Judge,

8   and so I don't know if you allow the indictment to go

9   back with the jury.  Lots of Courts don't.

11:06:47 10   The indictment is not evidence.  There's a

11   jury instruction expressly on the indictment not being

12   evidence.

13   Most jurors never see the indictment.  The

14   indictment is simply to put the defendants on notice of

11:07:01 15   what they're charged with, and doesn't require the amount

16   of the specificity that the defendants claim that is

17   required here.

18   THE COURT:  Well, and on the notice point,

19   I'm going to struggle moving through the second

11:07:20 20   superseding indictment again, but I guess when I look at

21   Page 35, Page ID 1443, this is the Count 5 example that

22   Mr. Axelrod was working through earlier, I mean he says,

23   you know, other than the fact that on the line and the

24   table identifying Mr. Spivak as the defendant charged in

11:07:43 25   Count 5, there's no connection to Mr. Spivak whatsoever

1    when you trace it through.

2                So what -- what from a notice perspective,

3    what knowledge does he actually have so that he can be

4    prepared on the trial date to meet that allegation?

5                MR. ABREU:  Your Honor, aside from the

6    factual allegations that are incorporated into the

7    counts, it's that the defendant, Paul Spivak, had the

8    knowledge and used the instruments of interstate commerce

9    to employ a device, made a -- you know, the A, B and C of

10   10b-5, and that gives him the exact notice of what it is

11   that he's alleged of doing, the date that the act

12   occurred on October 14th, it was 20,000 shares, and there

13   was $5,000 proceeds of that stock sale.

14               THE COURT:  And in the context of a

15   conspiracy charge, I understand that this is the

16   substantive charge that's related, so presumably if, when

17   you trace it through, if Mr. Spivak is not directly

18   involved with that transaction, he'd be involved as a

19   member of the conspiracy as charged.

20               But it's a little bit hard for Mr. Axelrod

21   to sit down with his client and Mr. Axelrod says, "Come

22   on, sir, you must have some knowledge."  He says, "No,

23   look, I don't know, on October 14th I was in France," or

24   whatever it was, "Like, I wasn't involved in this," so it

25   becomes a little bit -- I mean, you understand the

1    problem from the trial preparation side.

2                    MR. ABREU:  I do, Your Honor.

3                    But looking at the incorporated

4    allegations, Paul Spivak is the CEO of the company.  He

11:09:18  5    is at the top of this conspiracy as alleged in the

6    indictment.

7                    He is the one who was issuing the stock.

8    He is the one with the relationships and hired

9    the -- what was the language he used in his advertisement

11:09:34 10    on Craigslist?  He needed --

11                    THE COURT:  He needed Wolves of Wall

12    Street.

13                    MR. ABREU:  Wolves of Wall Street and

14    bullshit artists, right?  He's the person who recruited

11:09:44 15    these individuals, so yes.

16                    10b-5, 78j(b), the Title 15 offense,

17    includes aider and abettor liability.  There is a

18    conspiracy, and so he is -- that's why Paul Spivak is

19    charged with most of these counts.

11:10:05 20                    And, frankly, many defendants can be

21    charged with these counts.  It's just that the grand jury

22    indicted Mr. Spivak on all of the counts that they

23    indicted him on.

24                    Could others be indicted for them?  Yes.

11:10:19 25    Could Ms. Smirnova be indicted for several of these

1    counts?  Absolutely.  Was she?  No.

2              Is that a decision that the Government and

3    the grand jury -- the Government made to present to the

4    grand jury and the grand jury ultimately made?  Yes.

5              Is that permissible?  It happens all the

6    time, Your Honor.

7              THE COURT:  So let me -- on -- since you

8    mentioned Ms. Smirnova, let me, you know, raise one issue

9    or concern there.

10             This is not necessarily a question that

11   goes to sufficiency of the charge or the second

12   superseding indictment necessarily, but you would agree

13   that at least on the face of the indictment there's a lot

14   less implicating her or directly involving her.

15             MR. ABREU:  There is, Your Honor.

16             And an exercise of prosecutorial discretion

17   limited her to two counts with five years stat maxes for

18   a particular reason.

19             That's my decision to make, the United

20   States' decision to make in terms of asking the grand

21   jury to return an indictment against Ms. Smirnova.

22             Could we have charged her with more?  Yes.

23   Could we have proved those charges?  I think we can, but

24   we elected not to.

25             And what we include in the indictment is a

1    mere drop in the bucket in terms of the evidence that's

2    been provided to the defendants in discovery.

3                    THE COURT:  Was it -- was it four

4    terabytes?  Do I remember that right, or am I confusing

11:11:48  5    that with a different case?

6                    MR. ABREU:  It's about four terabytes.  It

7    could be anywhere from two-and-a-half to four terabytes,

8    depending on how it's broken out.

9                    THE COURT:  What's a terabyte amongst

11:11:58 10    friends?

11                    MR. ABREU:  Right.

12                    But hundreds of text messages.

13    Ms. Smirnova is constantly text messaging back with the

14    Wolf of Wall Street types with Ms. Lesh.

11:12:10 15                    Those, all of that, evidentiary issues.  I

16    mean, Mr. McCaffrey said it, this is -- his issue is

17    that, you know, he doesn't believe there's enough

18    evidence for the grand jury to have properly indicted

19    Ms. Smirnova.

11:12:25 20                    Again, he's arguing evidence.  He's not

21    arguing that the indictment is insufficient or -- I mean,

22    they are arguing that, but they're blurring the line and

23    really arguing that the evidence is insufficient.

24                    The -- if this were the upside down from

11:12:47 25    stranger things, right, the other side of these motions

1    are motions for Bills of Particular, right?  "I don't

2    understand what I'm charged with.  Give me more detail."

3                      And this indictment gives them the exact

4    detail, a lot more detail than many conspiracy

11:13:03  5    indictments, by providing them with the types of

6    activities that they did, how they manipulated the USLG

7    stock, and what companies they used to do it, and then

8    lots of examples in terms of the overt acts that they

9    used to accomplish those objects.

11:13:19 10                      I'm not sure what else the defendants

11    really want aside from an entire roadmap that would lay

12    out these are the three ways you -- these are the only

13    three ways you could be convicted of this crime because

14    you did X, Y and Z.

11:13:40 15                      And that's just not the case.

16                      THE COURT:  So the other issue I wanted to

17    have you speak to, it's one I spent some -- but again not

18    enough -- time on to this point, and it's the commission

19    issue that the defendants have raised.

11:13:55 20                      MR. ABREU:  So I briefly looked at

21    the -- some summaries on that Supreme Court opinion.

22                      I don't think it's going to change the

23    Court's determination of this case because I think the

24    Ninth Circuit case I cite, *United States versus Laurenti*,

11:14:16 25    is in line with that case.

1           And it's one that there is no general duty

2      to speak, and as the Court pointed out, until you do.

3           And here, if the Government cannot prove

4      that they had a -- that they omitted a material fact

11:14:39  5      after speaking, then, you know, I imagine that they'll be

6      making a motion -- well, they'll probably make a motion

7      anyway for Rule 29 directed verdict, but that would be

8      the appropriate time to argue that, you know, we did not

9      show that that defendant had created a situation where he

11:14:59 10      had to reveal this material fact that he was obtaining a

11      50 percent commission.

12           The fact is I think at trial what will be

13      shown is that these defendants asked an investor or

14      asked, you know, any investors as an example to invest

11:15:16 15      $10,000 to buy X number of shares.  It turns out those

16      numbers of shares really cost half of what they invested

17      because the other half of what they invested went to pay

18      them.

19           And so simply by stating $10,000 for 20,000

11:15:32 20      shares, there's your fraud.  That's the lie.

21           Were there other lies?  Absolutely.  Were

22      they using fake names?  Yes.  Were they misrepresenting

23      the amount, the hold period that they couldn't sell the

24      stock in?  Yes.

11:15:46 25           There were lots of other

1    misrepresentations, but here the conduct of material

2    omissions in terms of the undisclosed commissions and the

3    kickbacks, certainly illegal.

4                  The United States has --

5                  THE COURT:  Are there -- are there other

6    cases or other decisions coming out of other prosecutions

7    on that theory that I should be looking to to see how

8    they handled arguments like the ones the defendants have

9    advanced, or is this -- I had a different case where

10   there was a white collar prosecution where one of your

11   colleagues argued there was the first time the Department

12   of Justice has made such an argument so I shouldn't go

13   spend the time?

14                 MR. ABREU:  No, Your Honor.

15                 I've personally charged this offense for

16   the last four years and convicted probably two dozen

17   defendants, including one in this court that the Court

18   accepted a plea from Jason Arthur for this very conduct.

19                 There's another case pending in front of

20   Judge Oliver.

21                 Several defendants were convicted, pled

22   guilty and were convicted of the same conduct before

23   Judge Pearson.

24                 And Your Honor has another case with the

25   same undisclosed commissions being paid because this is

1    the issue with hiring Wolf of Wall Street types and

2    bullshit artists is that you have to pay them.

3              And if you tell investors what they're

4    actually being paid, they won't invest.  And that --

11:17:23    5    THE COURT:  Does it make a difference -- I

6    suppose this is a question for a jury ultimately -- but

7    does it make a difference if the -- I mean, it seems like

8    your theory turns on the actual fair market value as it

9    were of the stock, the consideration and the transaction

11:17:45   10    being half of what -- you know, the 50 percent sits on

11    top of fair market value.

12              But if the fair market value is, you know,

13    100 X, and the commission's being taken out of that, you

14    know, the investor is getting, you know, 100 X of value

11:18:09   15    and the commission's being taken out of what's being

16    delivered on the market side, I mean is that ultimately

17    the factual issue?

18              MR. ABREU:  No, Your Honor.

19              I think the factual issue would be what the

11:18:23   20    investor is being told the money is being used for.

21              And if the money is -- if what --

22              THE COURT:  I guess it's a materiality

23    question.

24              MR. ABREU:  Correct.

11:18:33   25    THE COURT:  Because if the -- if the

1    investor's getting close to fair market value for the

2    consideration paid, then I don't think the investor

3    necessarily cares whether the commission's one dollar or

4    $10 or $90 of the hundred.

5              If it's -- if the investor's actually

6    getting 50, the investor might care a lot.

7              But, you know, again, I don't have the

8    evidence at this point.  I have talked about terabytes,

9    but I haven't certainly had them made available to me or

10   even spent any time, if they were, looking at them.

11             So I don't know if -- if any investor even

12   asked the question.

13             MR. ABREU:  Your Honor, that's -- it's an

14   interesting point.

15             I don't know that I'm prepared to speak on

16   that issue in terms of specificity of what the --

17             THE COURT:  If you don't speak, there's not

18   going to be a duty.

19             No, I couldn't resist.  Sorry.

20             MR. ABREU:  Oh.

21             But I think the general point is that they

22   were just told this money is to invest in this company.

23             These investors were, you know, invited to

24   fly out to Cleveland and toured the facility with

25   Mr. Spivak and, you know, had understandings of what

1    their money was supposed to be used for:  The company;

2    not paying Mr. Bongiorno, Mr. Arthur 50 percent of their

3    investment.

4              And so, Your Honor, going back to the

5    arguments on Count 1, I -- wholesale, I think these are

6    arguments that are ripe for, you know, a post-trial

7    motion for a directed verdict, a Rule 29 motion.

8              You know, they're about the sufficiency of

9    the evidence.  They have nothing to do with whether the

10   counts are alleged properly.

11             They have the notice that's required by the

12   law, and the Court should deny the motions as they are.

13             THE COURT:  All right.  Thank you.

14             Well, in the interests of time, and I do

15   think I certainly have work to do, I know you could

16   probably go another hour on Count 1, but I do want to

17   turn to Count 2 and there's other motions as well.

18             So if we could turn to Count 2.

19             MS. ENGELMYER:  Good morning, Your Honor.

20             Lauren Engelmyer on behalf of Paul Spivak.

21             I will argue our motion to dismiss Count 2,

22   which we filed on behalf of both Paul Spivak and Olga

23   Smirnova.

24             There are three grounds to dismiss Count 2

25   of the second superseding indictment.

1          First, Count 2 should be dismissed because

2     it misrepresents the facts and suggests that there was an

3     error in the grand jury proceedings.

4          Second, Count 2 should be dismissed because

5     the Government entrapped the defendants.

6          And, third, Count 2 should be dismissed

7     because it fails to state a claim.

8          First, in Count 2, the Government presented

9     a false reality to the grand jury.  Under Federal Rule of

10     Criminal Procedure 12(b)(3)(A)(v), a defendant can move

11     to dismiss an indictment based on alleged errors in the

12     grand jury proceedings.

13          According to the Supreme Court, in *Bank of*

14     *Novia Scotia versus United States*, dismissal on this

15     basis is appropriate if the defendant can show that the

16     errors substantially influenced the grand jury's decision

17     to indict.

18          I'm going to start with the clearest

19     glaring error in Count 2.

20          When you read the overt acts section of

21     Count 2, you would think that on February 15th, 2021,

22     Spivak and Smirnova contacted people to purchase USLG

23     stock and those people just happened to be working with

24     the Government.

25          It's written as if on this day, the

1    defendants sought out new co-conspirators to go commit

2    securities fraud.

3                This is completely false, and we know it's

4    false because the Government produced over 50 hours of

11:22:54  5    recorded calls and meetings, undisputed evidence.  They

6    created the evidence and produced the evidence that tells

7    a different story.

8                Count --

9                THE COURT:  So doesn't that decision

11:23:06 10    ultimately belong to the jury then and not to me?

11                MS. ENGELMYER:  The question of whether

12    dismissal of an indictment is appropriate is an

13    appropriate question for the Court.

14                THE COURT:  I understand that.

11:23:19 15                But my question is in light of all the

16    evidence you referenced that the Government provided to

17    you convincing you that there's a substantial error or

18    false reality -- however you want to characterize it --

19    that gives rise to Count 2, in light of that volume of

11:23:41 20    evidence, doesn't that shift it to being a jury question?

21                MS. ENGELMYER:  I don't believe the volume

22    of evidence determines that decision.

23                The fact that there is undisputed evidence

24    here, and because it is undisputed it's a matter that's

11:23:58 25    appropriate for --

1          THE COURT:  I think Mr. Abreu is going to

2     dispute the evidence.

3          MS. ENGELMYER:  It's evidence that the

4     Government created and produced.

11:24:07  5          And there's no -- there may be disputes

6     about how to understand the evidence, but this is not a

7     case where you have to weigh competing testimony or, you

8     know --

9          THE COURT:  And it sounds like -- and I

11:24:21 10    don't mean to skip too far ahead -- but it sounds like in

11    an entrapment sense you're arguing on an objective

12    standard, not a subjective standard, which might be fine

13    in the State of Michigan, for example, but here in

14    Federal Court we use the subjective standard.

11:24:38 15          MS. ENGELMYER:  That's right.

16          The entrapment claim is based on, yes, an

17    objective standard where the -- as a matter of law, the

18    undisputed record shows that the Government induced the

19    defendants and that they were not predisposed to commit

11:24:57 20    the crime.

21          THE COURT:  I guess my point is that there

22    are some jurisdictions that you examine, under an

23    objective standard, whether the defendant was entrapped,

24    and that under an objective standard would focus on the

11:25:09 25    conduct of the Government.

1          But that's not the standard under federal

2     law as in *Sorrells*.

3          MS. ENGELMYER:  So I think both standards,

4     though, require an understanding of what the Government

5     did and whether there was a predisposition on --

6          THE COURT:  Well, I think the subjective

7     standard requires predisposition.

8          And, you know, one of the questions I've

9     had, this starts to take us a little bit far afield so my

10    apologies for that, but on the predisposition question,

11    my understanding of federal law -- again I have some work

12    yet to do on this -- is that if you assert the defense

13    and argue it at trial, that the burden rests with the

14    Government to prove predisposition beyond a reasonable

15    doubt.

16         That seems kind of dicey for your client,

17    it seems to me.  I mean, that seems to open the door to

18    all sorts of evidence that otherwise would not come in,

19    either strictly under the Rules or simply on a 403

20    analysis.

21         But if you're going to make the argument,

22    it seems like there's going to be some that comes in that

23    maybe Mr. Spivak would not like to come in.

24         MS. ENGELMYER:  That's a very good point,

25    Your Honor, and we understand that.  And these are, of

1     course, obviously issues, you know, we'll have to address

2     if this does move to a trial but --

3                   THE COURT:  But there's nothing that says

4     you don't make the argument now and not in front of the

5     jury.

6                   I'm not suggesting you're charging forward.

7     I'm just trying to -- some of the issues I've been

8     thinking about and working through.

9                   MS. ENGELMYER:  Yes, Your Honor.

10                  THE COURT:  But I interrupted you, sorry.

11                  MS. ENGELMYER:  No problem.

12                  Would you like me to continue on

13    entrapment?

14                  THE COURT:  Please.

15                  MS. ENGELMYER:  Or should I go back to --

16                  THE COURT:  Wherever you want to make your

17    argument.

18                  MS. ENGELMYER:  Sure.

19                  So I'll just quickly go through our basis

20    for dismissal of the indictment because the grand jury

21    here was misled.

22                  The indictment omits that for three months

23    prior to this February 15th, 2021 meeting, CHS and the

24    undercover agents aggressively pursued Spivak and tried

25    to get him to engage in questionable conduct.

1          It omits that in response to these repeated

2     solicitations, Spivak told the Government's agents that

3     he could only sell restricted stock from a private

4     placement at 15 cents a share and that he could not

11:27:33  5     advertise the stock.

6          Your Honor obviously has our motion papers

7     and the transcripts that we attached as exhibits.  We

8     appreciate that those exhibits are long, so I actually

9     prepared a chart summarizing those exhibits to aid Your

11:27:47 10     Honor's review, if I may share with Your Honor.

11          THE COURT:  Anything that aids my review,

12     I'm all in favor of.

13          Thank you.

14          MS. ENGELMYER:  So, you know, there's a lot

11:28:07 15     in the recordings, and this is all in the time period,

16     the three months that precede when the Government alleges

17     the conspiracy began.

18          In short, the sting begins when CHS cold

19     called USLG on November 12th, 2020 to ask about investing

11:28:28 20     in the company.  CHS was told on this and at least 15

21     other occasions that the company was selling in a

22     registered private placement at 15 cents a share and that

23     price could not change.

24          CHS devised a scheme to introduce Spivak to

11:28:44 25     undercover agents posing as wealthy investors.  He

1    described these people as "big hitters" and "fixes to all

2    the problems."

3                 He lured Spivak, Smirnova and their

4    3-year-old daughter to Florida on February 15th, 2021 and

11:29:00  5    his whole plan for that meeting was to convince Spivak to

6    let him promote USLG stock.

7                 Spivak protested that he did not need the

8    money right away; he was just concerned about getting

9    USLG on NASDAQ as quickly as possible, and that he was

11:29:18 10    not comfortable promoting the stock until he had audited

11    financial statements.

12                 After several hours of pressuring on top of

13    three months of aggressive pursuit, Spivak finally agreed

14    to let U.S. -- I'm sorry -- to let CHS market the stock

11:29:35 15    to raise the profile of the company.

16                 Based on this evidence which, you know, I

17    just summarized sort of not going into detail on

18    everything, it's clear that Count 2's narrative is

19    inaccurate.

11:29:46 20                 It's also critical to point out that there

21    are examples of factual allegations in Count 2 that are

22    just wrong.  They are directly contradicted by the

23    recordings.

24                 First, I'd like to direct Your Honor to

11:30:00 25    Paragraph 46-a of Count 2, which alleges that on February

1    15th, 2021, Spivak solicited undercover agents to

2    purchase stock.

3              But it was just the opposite.  That's

4    exactly what the recordings show.  Spivak solicited no

11:30:19  5    one, and it was the undercover agents that repeatedly

6    asked Spivak if they could buy stock.

7              Second, Count 2 alleges at Paragraph 46-c

8    that on March 10th, 2021, Spivak agreed to have Scott and

9    Church sell shares to an undercover federal agent for

11:30:40 10    25,000 each as a test.

11              It alleges that Spivak stated, after the

12    test transactions, they would negotiate the sale of the

13    remaining six million held by Scott and Church.

14              This is wrong.  It was the confidential

11:30:56 15    source, not Spivak, that made those statements.

16              CHS was the one that said that he had a

17    game plan to buy shares from Church and Scott as a test

18    run.

19              In response, Spivak said it would be

11:31:09 20    cheaper to just buy in the market.

21              CHS insisted that they wanted to buy these

22    shares from Church and Scott because if it worked, they

23    would buy the remaining shares.

24              The fact that CHS and not Spivak made these

11:31:24 25    statements matters.  It means that Spivak did not do what

1     the Government here alleges.

2                       For the same reasons, the allegations that

3     Spivak caused wire transfers from Government-controlled

4     bank accounts to Church and Scott's bank accounts is

11:31:42  5     wrong.  He didn't cause anything.

6                       Assuming, which we contend is a reasonable

7     assumption, that Count 2 includes the facts that were

8     presented to the grand jury, and the Government does not

9     dispute this, it's clear that the Government presented a

11:31:58 10     false reality.

11                      Additionally, it's likely that the

12     Government failed to instruct the grand jury on the

13     affirmative defense of entrapment.

14                      These errors satisfy the standard under

11:32:12 15     *Bank of Nova Scotia*.  How could the grand jury accurately

16     assess Spivak's intent to defraud when it was told that

17     Spivak said things that the Government's agent actually

18     said, or without understanding that the Government sought

19     to coerce Spivak to commit a crime?

11:32:31 20                      The prejudice here is evident.

21                      I'm going to move on to our second basis

22     for dismissal, unless Your Honor has any questions before

23     I do that.

24                      THE COURT:  No.  Go ahead.

11:32:43 25                      MS. ENGELMYER:  So the second basis to

1    dismiss Count 2 is entrapment.

2                     A valid entrapment defense has two related

3    elements, and this is from a Sixth Circuit case *United*

4    *States versus McLernon*.

5                     First, that the Government induced the

6    crime; and, second, that the Government lacked a

7    predisposition to engage in the criminal conduct.

8                     The Sixth Circuit has held that entrapment

9    may be established as a matter of law if the undisputed

10   evidence demonstrates that the Government agent engaged

11   in conduct which overbears an otherwise innocent person's

12   will and thereby induces him to commit a criminal act

13   that he was not disposed to commit.  And this is from

14   *United States versus Jones*, a Sixth Circuit case from

15   1978.

16                     So the first element here, the criminal

17   design, originated with the Government.  The undisputed

18   evidence in the forms of hours of recorded calls and

19   meetings demonstrates that Spivak and Smirnova were the

20   targets of the Government's repeated efforts over six

21   months to create a crime.

22                     As discussed, the agents tried to get

23   Spivak to sell outside of the registered placement.  The

24   Government devised the scheme to promote USLG stock, and

25   worked hard for months to convince Spivak over his

1    repeated objections.

2              Finally, it was the Government, not Spivak,

3    that came up with the plan to buy free-trading stock from

4    Church and Scott.

11:34:15    5              Moving on to the second element, the

6    undisputed evidence shows that Spivak and Smirnova were

7    not predisposed to commit a crime.

8              The Sixth Circuit generally considers a

9    number of factors.  This is also from *United States*

11:34:30   10    *versus McLernon*.  They are the character and reputation

11    of the defendant, including any prior criminal record;

12    whether the suggestion of criminal activity was initially

13    made by the Government; whether the defendant was engaged

14    in criminal activity for profit; and whether the

11:34:46   15    defendant evidenced reluctance to commit the crime.

16              All of these favors weigh -- all of these

17    factors weigh in favor of the defendants.

18              First, Spivak and Smirnova have no criminal

19    history.  Not only that, but Spivak was investigated by

11:35:02   20    the SEC for this very conduct, and the SEC declined to

21    bring an enforcement action against him.

22              Second, as discussed above with respect to

23    the first element, the suggestion of criminal activity

24    was entirely made by the Government.

11:35:16   25              Third, there is no evidence that Spivak

1    personally profited from any sale of USLG -- USLG

2    securities.

3            The indictment never alleges that Spivak

4    sold any of his USLG stock, and as my colleague pointed

11:35:33  5    out that's because he had over 50 million shares of stock

6    and only sold a small portion.

7            Spivak and Smirnova's goal was always to

8    grow the company, its product line, and shareholder

9    value.

11:35:47  10           This is supported by the fact that Spivak

11   and Smirnova poured their money into the company to keep

12   it afloat.  Spivak guaranteed all of the company's loans.

13   And he deferred his salary during the time of the alleged

14   conspiracy.

11:36:02  15           Clearly any dump would only hurt Spivak and

16   Smirnova.

17           Fourth, as discussed, Spivak and Smirnova

18   repeatedly evidenced a reluctance to commit any crime.

19   In addition to the examples I've --

11:36:17  20           THE COURT:  I guess -- I guess the rub on

21   this one is that, I mean, every entrapment case I've read

22   has that exact same fact pattern where there's an initial

23   reluctance and eventually the defendant gives in.

24           And whether -- whether that turning point

11:36:36  25   suffices under the law, isn't that for the jury here?

1           I mean, a jury might well agree with you

2     that this was all the idea of the Government and they put

3     him up to it, and had they not done this, none of this

4     would have happened.

11:36:54  5           They might well agree with that.  But a

6     jury might say these were the halfhearted protestations

7     of someone who was saying and doing the right things

8     until he didn't.

9           MS. ENGELMYER:  We appreciate that

11:37:12 10     entrapment is a complicated affirmative defense and often

11     it is a jury question.

12           But the Sixth Circuit has clearly held that

13     it can be established as a matter of law where the

14     undisputed evidence shows inducement and no

11:37:29 15     predisposition.

16           And --

17           THE COURT:  Is that more appropriate on

18     Rule 29?

19           I'm still working, I haven't had a chance

11:37:39 20     to read all these cases yet, but, I mean, it seems to me

21     that that's probably the procedural posture in which the

22     issues arise or go up.

23           I could be wrong.  I haven't read all these

24     cases yet.

11:37:52 25           MS. ENGELMYER:  I would have to look into a

1    little bit more closely the exact procedural posture of

2    all of these decisions, but the Sixth Circuit case that's

3    very helpful here, *United States versus Jones*, clearly

4    says that it's the duty of the Trial Judge to determine

11:38:10  5    whether the evidence is in dispute or whether the

6    question can be resolved as a matter of law.

7            So we think that's appropriately a question

8    for Your Honor.

9            And --

11:38:21  10           THE COURT:  I agree with that.

11           I guess that becomes a question of timing,

12   whether it's on Rule 29 where we have the evidence and

13   the Government has rested, or we're sitting here reading

14   an indictment as it were.

11:38:35  15          MS. ENGELMYER:  Right.

16          We understand.  We submit this is really a

17   unique scenario, which is that the Government created and

18   produced 50-plus hours of recording which they can't

19   dispute the credibility of that evidence.  It's their

11:38:54  20   evidence.

21          So in this situation, that is undisputed

22   evidence that Your Honor can consider whether this is one

23   of those unique cases where entrapment can be established

24   as a matter of law.

11:39:11  25          You know, in this --

1          THE COURT:  No, go ahead.

2          MS. ENGELMYER:  I was just going to say,

3     you know, three months of pursuit and coercion, which is

4     all evidence that we can fairly assume was not presented

11:39:38  5     to the grand jury, is critical.

6               And, you know, in sum, the evidence shows

7     that the Government sought to entrap these defendants and

8     Count 2 can and should be dismissed on this basis.

9               Third and finally, Count 2 should be

11:39:57 10     dismissed on the independent basis that it fails to state

11     a claim against Spivak and Smirnova for conspiracy to

12     commit securities fraud.

13               I'll note that the Government failed

14     entirely to respond to this argument in its opposition

11:40:13 15     brief, likely because even post-indictment, the

16     Government has not found a theory of securities fraud

17     that is supported by admissible evidence.

18               One would think that if there was a crime,

19     it would be somewhere in the 50-plus hours of recorded

11:40:29 20     calls and meetings.  It's not there.

21               Count 2 recites the elements of securities

22     fraud as it does in Count 1, but it never cogently says

23     what illegal conduct the defendants conspired to commit.

24               My colleague went through this extensively

11:40:47 25     in Count 1, but, you know, the allegations are similar in

1    Count 2.

2              Count 2 alleges that Spivak and Smirnova

3    solicited would-be promoters to purchase free-trading

4    shares.  As discussed, that's just not true.

11:41:03  5              But even if it were true, it's not fraud to

6    promote your company's stock.  There's no evidence that

7    Spivak or Smirnova intended to make false statements,

8    that they did, or that they intended to mislead

9    investors.

11:41:17 10              Count 2 alleges that Spivak and others

11    arranged to artificially inflate the price of USLG shares

12    by creating and releasing favorable press releases.  As

13    Mr. Axelrod said, you know, extensively favorable press

14    releases are not illegal.

11:41:33 15              There is not a single allegation, despite

16    hours of recorded calls and meetings, that Spivak

17    discussed publishing false press releases, false

18    marketing material.  There is just no evidence.

19              The securities and wire fraud counts

11:41:51 20    associated with Count 2 also fail to state a claim.

21              I think those arguments are fairly simple

22    and straightforward in our motion, so I was not going to

23    go through those, but I'm happy to if Your Honor would

24    like.

11:42:00 25              THE COURT:  All right.  No, I think I've

1    got my questions on the table, so unless there's anything

2    further on the defense side, Mr. Abreu, happy to have you

3    speak to Count 2.

4              MS. ENGELMYER:  Thank you, Your Honor.

11:42:12  5              THE COURT:  Thank you.

6              MR. ABREU:  Thank you, Your Honor.

7              Well, I guess addressing first the point

8    that we didn't respond to, the fact that Count 2, their

9    claim that Count 2 is not a claim, it's the same argument

11:42:34 10   that they made in Count 1.  I don't think it's necessary

11   to repeat arguments per count.

12             It is a crime to -- you can commit -- you

13   can take legal acts to commit a crime, right?  You can

14   mail a piece of paper, that is not illegal.  If you're

11:42:55 15   doing it with illegal intent to defraud somebody, to

16   commit a crime, it is a crime.

17             So it doesn't matter that they were -- that

18   the press releases were favorable or that they were even

19   true.  If they were released with the intent to defraud

11:43:12 20   and as part of the scheme, then they're relevant to the

21   crime that's at issue.

22             Your Honor, I think to your point on the

23   entrapment issue, one, obviously I'll dispute until I'm

24   blue in the face that there was any entrapment because

11:43:27 25   the Government does dispute the evidence or at least the

1    defense's interpretation of the evidence.

2              Do we dispute that 50 hours of recording

3    exists?  No.  Do we dispute what those recordings mean or

4    what the defendant really means when he says certain

11:43:45 5    things in those recordings?  Absolutely.

6              And that's a matter for the jury.

7              But if after the Government's case the

8    defense makes a Rule 29 motion and the Court finds that,

9    you know, no reasonable juror could make that

11:43:59 10   determination based on the evidence that was admitted at

11   trial, then Your Honor dismisses the count.

12             That's the correct procedural posture for

13   this, because as is evident with all of these motions to

14   dismiss, this is about evidence, a dispute about evidence

11:44:21 15   and, you know, that the Government didn't precisely lay

16   out exactly what Mr. Spivak did to violate the law, when

17   in fact it has pled sufficiently -- and with a lot more

18   detail than it usually does -- what the violation was

19   here.

11:44:38 20            In terms of the defense's argument that the

21   Government's misrepresenting the facts, Your Honor, it's

22   simply not true.  We dispute that as well.

23             But again, I wasn't going to spend a lot of

24   time in a brief arguing facts because this isn't the

11:45:02 25   proper vehicle to do it, and Your Honor should not be put

1    in the position of listening to 50 hours of phone calls

2    to determine who's right about what a particular call

3    means and whether Mr. Spivak was predisposed.

4              If, looking at the indictment in the manner

11:45:22  5    most favorable to the Government at this stage, that the

6    allegations were accepted as true as they are, and we've

7    alleged Count 1 as securities fraud occurring before this

8    period in 2020, that Mr. Spivak committed securities

9    fraud before 2020, then he's predisposed.

11:45:41  10             There is no real issue as to entrapment

11    relative to this 2020 time frame.

12             THE COURT:  I think one of the concerns,

13    excuse me, I hear from the defense goes back to an issue

14    I asked when we were talking about Count 1, which is

11:46:05  15    cherry-picking of evidence and so on.

16             If things are taken out of context or the

17    like, you can make -- I think in this election year of

18    all years we know that that lies in our future, but I

19    think we all understand the point, and I think the

11:46:23  20    concern is that that might have gone on or had some

21    bearing on what the grand jury returned.

22             And so, I mean, I take the point about what

23    is for a jury, what's for Rule 29, but I think here on a

24    motion to dismiss the question is probably more

11:46:41  25    front-loaded and focused on the integrity of those

1    proceedings.

2                    MR. ABREU:  Your Honor, again the

3    defendants haven't met the bar of establishing that there

4    was irregularity in the grand jury.

11:46:54  5              This isn't reason to believe that there's

6    irregularity in the grand jury because the law does not

7    require that the Government present the entire picture.

8                    And I'm not saying that we didn't, but

9    there is no requirement that we do that.  There's no

11:47:09 10   requirement that we present the grand jury with every

11   self-serving exculpatory statement that a defendant

12   makes.

13                   That's simply not the law.

14                   And obviously, there is a mechanism where,

11:47:24 15   you know, in particular cases where if Judges are

16   concerned about what the grand jury considered, that the

17   Judge could look at the transcripts in camera.

18                   But, Your Honor, I'd submit that here, this

19   is literally throwing everything against the wall to see

11:47:41 20   what sticks.  And none of it sticks because a lot of it

21   just is about the evidence and it doesn't really make

22   sense from a legal perspective that, you know, Mr. Spivak

23   was entrapped or that they were simply misled because of

24   the overt acts that the Government chose to include, by

11:48:02 25   starting the conspiracy date on the date that he agreed,

1  first made the open agreement, the most clear agreement

2  to commit a criminal act.

3  That it started on that date, and that the

4  overt acts that support that allegation in Count 2 are

11:48:24  5  listed from that date forward does not automatically mean

6  that the grand jury is -- has been tampered with or

7  hasn't received the correct legal instruction because,

8  you know, it's obvious that the Government was trying to

9  hoodwink the grand jury to indict Mr. Spivak.

11:48:43 10  Again, that's just throwing things against

11  the wall without any proof.

12  And --

13  THE COURT:  Let me make sure I understand

14  your predisposition argument as well.

11:48:51 15  Is your argument that because of the

16  different time periods charged in Count 1 versus Count 2,

17  that Count 2 comes later, so the predisposition arises

18  from the fact of the earlier acts of securities fraud?

19  MR. ABREU:  Your Honor, I think that's one

11:49:08 20  way to get over that, that bar, or at least one way to

21  show the Court in the legal sense, if accepting the facts

22  of Count 1 as true, then Mr. Spivak is predisposed

23  because he committed securities fraud months before

24  Count 2.

11:49:30 25  And if he's taking that action in Count 1,

1   one could infer why the Government approached Mr. Spivak

2   as part of an undercover operation, because of that

3   conduct.

4                   Now, I think the defense's response was

11:49:50   5   "The SEC cleared us."  Well, that's not what the SEC did.

6   They didn't decide to charge you.

7                   I can't speak for the SEC.  They are on the

8   civil side.  I'm on the criminal side.  And whatever the

9   SEC decided to do, they decided to do.

11:50:06  10                  But I think if Your Honor looked at the

11   letter that they sent to Mr. Spivak, they particularly

12   disclaimed any -- making any judgment about whether he

13   committed any kind of violation of law or not.

14                  THE COURT:  It is a little unusual to see

11:50:21  15   the sequencing between the DOJ and the SEC in this case.

16   Usually you see it go the other way, where on the

17   criminal side you might say, "We're not going to pursue

18   criminal charges because of the proof beyond a reasonable

19   doubt standard, but that certainly leaves you open to

11:50:38  20   civil claims under a lower standard."

21                  And here, the SEC exercising its

22   discretion, for whatever reason, not to move forward, I'm

23   not saying it's dispositive or anything, but it does

24   raise an eyebrow.

11:50:54  25                  MR. ABREU:  Well, Your Honor, I can tell

1    you the very simple answer is that the two sides of the

2    house have two very different toolsets and no -- and

3    sometimes do not do parallel investigations.

4              This was not a parallel investigation, and

11:51:08  5    the SEC didn't have access to the information that the

6    United States from DOJ on the criminal side had.

7              Had they, they may have made a different

8    decision.  I don't know.

9              But we obviously can't share grand jury

11:51:20 10   materials with the SEC, and the SEC doesn't have the same

11   tools that we do.  And so different decisions were made.

12              Often there are parallel investigations,

13   and then you see some kind of coordinated action.  But,

14   yeah, this one is a little unusual in that.

11:51:40 15              THE COURT:  I mean, it's not unprecedented.

16   It's not a unicorn as far as I can tell.  It just raises

17   an eyebrow.

18              Returning to predisposition then, I suppose

19   if a jury were to acquit on Count 1, your predisposition

11:51:54 20   argument on Count 2 becomes a little bit harder in the

21   face of an entrapment argument made to the jury.

22              MR. ABREU:  It would be if Your Honor

23   rejected all of the arguments relative to what's in the

24   actual recordings themselves pre-dating that February,

11:52:07 25   2021 date where Mr. Spivak talks about what they did

1    before with the other people.

2         I think there's one call that's provided in

3    one of the exhibits where Mr. Spivak actually described

4    Mr. Mallion as, "If you would put Chris Farley in Wolf of

11:52:31  5    Wall Street, you would have the guy that took us public

6    and we made every single mistake along the way.  I know

7    now not what to do."

8         An admission of exactly what they did,

9    dated -- and I believe that that happens, yeah, November

11:52:50  10   of 2020.

11        There's evidence in those calls, but again

12   not the appropriate time to lay all of that out and, you

13   know, ask the Court to make factual determinations that

14   should be the province of the jury.

11:53:13  15       But, yes, if we -- if the jury were to

16   acquit on Count 1, and there was no other evidence of

17   predisposition and they, the defense, raised this

18   argument of entrapment and no other evidence was

19   submitted, then, sure, I think it would be a harder bar

11:53:30  20   for the Government to meet.

21            THE COURT:  All right.  Thank you.

22            MR. ABREU:  Thank you, Judge.

23            THE COURT:  So there's motions to sever.

24   They're variously called motions to bifurcate, sever,

11:53:46  25   various other things as well, so I'm happy to hear -- I

1      do have some questions on this one as well.

2                          Happy to hear from whoever wants to speak.

3                          MR. AXELROD:  Your Honor, there was one

4      other motion to dismiss with respect to Counts 48 and 50.

11:53:59  5            THE COURT:  You are correct, and actually

6      Mr. Bongiorno had one on pre-indictment delay so I'm

7      getting ahead of myself here.

8                          So my apologies.

9                          So let's take up the last two motions to

11:54:08 10     dismiss.

11                         MR. AXELROD:  Yes.  And I'll be very quick

12     on this.

13                         We filed a motion to dismiss Counts 48 and

14     50.

11:54:14 15            48 charges a conspiracy to witness tamper

16     through intimidation, corruption, threatening.  There's

17     nothing in there.

18                         Essentially what the Government is trying

19     to do is criminalize the right to defend oneself by

11:54:27 20     finding witnesses to go talk to the FBI.  If you actually

21     look at the indictment itself, it says "Find this person

22     and tell them go talk to the FBI," and that's charged as

23     a conspiracy to witness tamper, which I will get to in a

24     second, but I find that I don't know how a grand jury

11:54:42 25     returned an indictment on that.

1          Of course, the Government did not even

2    respond to our motion to dismiss Count 48 which is

3    waiver.  I don't know of any rule that would allow the

4    Court to treat the Government as a preferential party,

5    but I know that in a civil case, if a party did not

6    respond to a motion, the substantive motion, a

7    dispositive motion, that motion would probably be

8    granted.

9          Count 50 --

10          THE COURT:  Maybe we should change that

11   rule to cut down on the length of briefs, but that's

12   different, different musings.

13          MR. AXELROD:  Fair enough.

14          That's Count 50, very similarly, they

15   charge Mr. Spivak with obstruction of justice in

16   connection with an investigation based on the fact that

17   Pretrial Services was going to go search his house for

18   weapons.

19          That's not an investigation.  That's a

20   Pretrial Services check review, but the Government paints

21   that as part of an FBI investigation.  It's simply not

22   true.

23          And I don't know how also that that got

24   charged, but again the Government didn't respond, so we

25   rest on our papers on those.

1          THE COURT:  All right.  Thank you.

2          Did you wish to speak to those issues,

3     Mr. Abreu?

4          MR. ABREU:  Yes, Your Honor.

11:55:50  5          The United States, well, my contention is I

6     did respond to those motions as in our response.

7          THE COURT:  I'll tell you, I'll be very up

8     front with you, I haven't gotten to these counts in my

9     prep work so I don't know if you have or haven't.  I have

11:56:10 10    no view on that one way or the other.

11          What I do recall is the proceedings we had

12    at the beginning -- well, maybe at 2:00 o'clock in the

13    case, maybe not at the very beginning, but shortly after

14    the beginning of the case.

11:56:22 15          As I recall, there were some issues with

16    rats and alleged witness intimidation, and Mr. Spivak's

17    counsel was really desiring to make a record on that, and

18    we never got to that for various reasons.

19          MR. ABREU:  Yes, Your Honor.

11:56:38 20          And I'll -- the thumbnail sketch is that

21    the Government's response does not address the factual

22    disputes that the defendant makes.

23          The Government's response lays out what is

24    required under the law to allege a crime in Count 1,

11:57:01 25    Count 2, and all the conspiracy counts, Count 1, Count 2,

1      Count 48; two or more persons conspired to commit -- to

2      commit an enumerated crime in Section 1512, and that the

3      defendant knowingly and voluntarily joined that

4      conspiracy.

5                    The allegations are made.  The manner and

6      means are provided in the indictment.  The overt acts

7      taken or the acts in furtherance -- I forget how they are

8      styled -- are laid out, that the defendants believed that

9      that is a legal act.

10                   The other way to say that is my defendant

11     didn't have -- or my client didn't have the specific

12     intent to commit a crime.

13                   That's a factual issue.  If I don't prove

14     intent or that he had corrupt intent when he was telling

15     people to put his daughter on the witness's lap to make

16     him feel bad so that he would change his story or talk to

17     the FBI, if that wasn't corrupt, and if the jury doesn't

18     agree with me, then I lose, if there's no other evidence

19     that I present.

20                   I believe that that was corrupt.

21                   In terms of the obstruction of federal

22     investigation, again, Your Honor, the United States

23     alleged what it alleged.  It is sufficient.

24                   I didn't want to get into an argument with

25     the defense over what the investigation was, but there

1    was just a search warrant at Mr. Spivak's office.

2    Mr. Spivak is concerned with computers that have evidence

3    from the Mallion days being discovered in his house.

4                    The search for the guns was a consent

5    search that related back to his detention hearing, but at

6    the time the Government was negotiating with former

7    counsel to obtain all the computers and guns in the

8    house.  And eventually, that was whittled down to the

9    firearms in the house, and that was what the consent was

10   provided for.

11                   That's not what Mr. Spivak was aware of

12   when he made that call.

13                   So what's the investigation?  The

14   investigation of the securities fraud.  There was a

15   complaint.  He hadn't even been indicted yet.  That's why

16   I wasn't going to get into a factual dispute about

17   whether there was an investigation or not.  That's for

18   the Government to prove.

19                   If the Government can't prove it, then the

20   Court will Rule 29 it after we rest, and the defendant

21   will be happy.

22                   That's all I have, Your Honor.

23                   THE COURT:  All right.  Thank you.

24                   And again, my apologies, Mr. Rosen,

25   regarding the -- I'll call it a pre-indictment delay

1   motion, which I have read.  I've been through those

2   papers.

3                   MR. ROSEN:  Well, I'm going to

4   short-circuit a little bit of this, Judge, because there

11:59:54  5   are certain acknowledgements I'm going to make that will,

6   I think, cut through a lot of the arguments.

7                   It is an unconstitutional pre-indictment

8   delay motion to dismiss, Your Honor, alleging abuse of

9   process and unfair -- the Government's unfair advantage

12:00:10 10   it obtained by way of its conduct in this case.

11                   That said, we will acknowledge that this

12   was an effort to cooperate with the Government, and we

13   will acknowledge that this was done at Mr. Bongiorno's

14   request and the Government's open acceptance of that.

12:00:30 15                   We acknowledge that Mr. Bongiorno signed

16   these waivers.

17                   All of that was done with the belief that

18   the Government was acting in good faith, which it may

19   have been at the time.  But what turned this upside down,

12:00:47 20   Judge, in my opinion is a couple of events.

21                   One, the nature and the timing of

22   Mr. Bongiorno's arrest.  After a year-and-a-half of what

23   I thought were good faith meetings, to have

24   Mr. Bongiorno -- I'm going to segregate, of course, our

12:01:11 25   motion on the argument to suppress from this -- but to

1    have Mr. Bongiorno arrested -- back up.

2              Early on in our conversations with the

3    Government, they asked for me to obtain Mr. Bongiorno's

4    passport during the course of our negotiations.  And I

12:01:26  5    accepted that and I have it.  So the Government was fully

6    aware that Mr. Bongiorno could not and was not going

7    anywhere.

8              The fact that they chose to arrest him on a

9    Friday afternoon at an airport with his wife and infant

12:01:38 10    child in the Virgin Islands, U.S. territory, knowing that

11    he was going to then spend the weekend in a local jail --

12    which turned out to be quite an event in his life -- when

13    all they had to do, after all these communications we've

14    had, was pick up the phone and say, "Listen, we've had

12:01:58 15    enough, we're indicting your client, bring him in Monday

16    morning."  Okay.

17              That triggered concern on my part as to

18    what had been happening all along.  We do know that

19    witnesses had been contacted, which I guess is the

12:02:14 20    Government's privilege, but in the course of that, the

21    nature and the conduct of the communications I've heard

22    evidenced to me that this was now becoming a "Let's get

23    as much information as we can from the defendant," the

24    putative defendant.

12:02:34 25              As the Court just commented, the oddity of

1    the SEC long-term investigation -- and Your Honor, I

2    think, appropriately asked all the parties early on "You

3    okay with the same Judge taking both matters," and it was

4    appreciated -- and we were -- that there were issues that

12:02:56    5    had come up in the nature of these communications, very

6    aggressive in the Government's contact of defense

7    witnesses.

8                    You know, Judge, the Government's position

9    on this case and the law is that we need to show specific

12:03:14    10    prejudice.  That's the law.  And I will concede that my

11    motion has not risen to that level.  We haven't.

12                    But that's the reason I've asked for an

13    evidentiary hearing, because I think we can establish

14    that how the Government proceeded, what the Government

12:03:33    15    was doing in the course of these 18 months of

16    negotiations with Mr. Bongiorno, producing the witnesses

17    that the Government has contacted, calling the agents to

18    find out what was really going on, that's how prejudice

19    is established.

12:03:48    20                    And there's no way I can do that without

21    that hearing.

22                    So we believe that while the language in

23    the waivers speak to, well, you're not going to challenge

24    this, underlying all of that is always the Government's

12:04:07    25    acting in good faith.

1           If they were, and it's established from the

2    witness stand, fine.

3           If they weren't, that's how we are able to

4    establish the prejudice.

12:04:18  5           And I think that we have at least risen to

6    the level of allowing the Court to have a hearing on how

7    the Government was conducting these -- this inquiry, why

8    it chose to arrest, and how it chose to arrest at that

9    moment.

12:04:36 10           You know, Mr. Abreu and I have had many

11    pleasant conversations.  I'm not a believer of repeating

12    to any court those conversations.  I don't think that's

13    the appropriate way to handle these matters.

14           But to say that I was taken aback by the

12:04:52 15    arrest would be an understatement, perhaps because I

16    was -- had a knee replacement the day before the arrest.

17    It was a busy day for me the next day.

18           So that being said, Judge, I think we have

19    at least risen to the level of being able to have the

12:05:09 20    Court conduct a hearing and to find out what was really

21    going on during the course of 18 months of negotiations

22    with Mr. Bongiorno.

23           THE COURT:  I guess I'm not sure how a

24    hearing would show prejudice, to analogize to the

12:05:24 25    discussion I was having with Ms. Engelmyer about the

1    entrapment issue.

2             It might establish some, from your

3    perspective, less than good faith or bad faith conduct on

4    the part of the Government or so forth, but I'm not sure

5    how that rises to the level of prejudice of the defense,

6    which is what I understand the case law in this area to

7    talk about.

8             I think if the Government were out there,

9    hypothetically, murdering witnesses who were going to

10   testify on your client's behalf, that would be one thing.

11   But I don't think there's any suggestion that anything so

12   shocking would be going on.

13            But I think prejudice has to go to a

14   specific right.  Presumably here it's the right to a fair

15   trial as protected under the Sixth Amendment and Article

16   3.

17            So I'm just not sure what, what specific

18   evidence an evidentiary hearing might develop.

19            MR. ROSEN:  Well, so, if it's an

20   unconstitutional delay that the Government was extending

21   the course of these meetings, these discussions, and of

22   course it's -- pardon the nature of my comment -- but

23   then it's sucking more information out of Bongiorno for a

24   purpose that wasn't as expressed.

25            It wasn't "Let's find a resolution to this

1    case that both parties can agree on," and if it was to be

2    able to contact defense witnesses that they may not have

3    known about, that becomes a question of prejudice,

4    becomes a question of good faith or bad faith, it becomes

12:07:10  5    a question of the Government's intentions.

6           I can't do that unless I've got an agent on

7    the stand to ask those questions.

8           If I got the answers that in my view would

9    be acknowledging that we were not just trying to settle

12:07:29 10   this case, but we were interested in being able to talk

11    to the witnesses in an aggressive fashion and a very

12    tainted fashion, Government murder, if you will, by

13    verbosity, it's like, you know, are you aware that this

14    man was doing this, this, this and that.

12:07:50 15           So that's how prejudice is established.

16           It isn't -- like I said, I acknowledge the

17    motion did not get to that place because it really

18    couldn't, but I think if we had that hearing and

19    established that there was not good faith, at some

12:08:08 20   point -- it may have started in good faith.

21           But, you know, Judge, I will -- I have the

22    page written down, but the Government indicated in its

23    response, "We determined Bongiorno was lying."

24           Well, then what are we doing?  Why are we

12:08:26 25   bringing him back to resolve the case if you don't

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
|          | 1  | believe what he's saying?                               |
|          | 2  | My history with that is, "Rosen, you're                 |
|          | 3  | client's lying, get him out of here and don't come back,|
|          | 4  | you know, we'll see you in court."                       |
| 12:08:40 | 5  | But 18 months' worth of debriefings and                 |
|          | 6  | conversations raises a question of what were they doing,|
|          | 7  | when did it turn, why were they continuing to get       |
|          | 8  | information from Mr. Bongiorno?                          |
|          | 9  | And again, I don't think the Court can just             |
| 12:08:53 | 10 | ignore this arrest.  It was, in my view, an exercise of |
|          | 11 | very bad faith by the Government.  All they had to do was|
|          | 12 | call me.                                                |
|          | 13 | So that tip of the iceberg causes me to say             |
|          | 14 | there's more here that we need to look at.              |
| 12:09:11 | 15 | THE COURT:  All right.  Thank you.                      |
|          | 16 | MR. ROSEN:  Yes, sir.                                   |
|          | 17 | THE COURT:  Mr. Abreu.                                  |
|          | 18 | MR. ABREU:  Your Honor, I have to breathe               |
|          | 19 | after reading this motion and listening to that argument|
| 12:09:27 | 20 | because this might be the most offensive motion I've    |
|          | 21 | received from a defense attorney relative to, like he   |
|          | 22 | said, 18 months of working with him and his defendant,  |
|          | 23 | his client, to resolve the case, offering him plea      |
|          | 24 | agreements, multiple times, allowing him the opportunity|
| 12:09:49 | 25 | to meet with my management to -- for declination        |

1     presentations, sitting through a 45-minute declination

2     video that they created, and then be accused of acting in

3     bad faith because his client decided to go to a U.S.

4     territory, which pops up on CBP's radar, and if there's

12:10:12  5     an active warrant because there was an indictment issued,

6     they arrested him.

7     Did I tell them to arrest him?  No.  Does

8     it matter?  No.

9     You know, is it -- it's not great that he

12:10:24 10     was arrested on a Friday and had to hang out in the one

11     prison or the one jail in the Virgin Islands, but guess

12     what?  It happens to defendants every day.  This isn't

13     personal against Mr. Bongiorno.

14     And Mr. Rosen's argument that, you know,

12:10:40 15     he's not going to talk to the Court about lawyer

16     conversations, and then file a motion saying, "I want

17     return of property, which I know isn't properly venued

18     here but Mr. Abreu said it's okay; I just want my cake, I

19     want to eat it, too; everybody did something wrong to me

12:10:59 20     because I wouldn't plead guilty."  You were offered a

21     plea.

22     He was offered a plea agreement.  He

23     declined it.  He was told he was going to be charged.  He

24     was charged, period.

12:11:08 25     No evidentiary hearing is needed.  This is,

1    again, this is an unwarranted motion that has no basis

2    and should be denied.

3                    Thank you, Judge.

4                    THE COURT:  All right.

12:11:27  5         MR. ABREU:  I don't know if you have any

6    questions.

7                    THE COURT:  No.

8                    All I was going to say, I guess two things.

9                    One, since you had made the cake and eat it

12:11:35  10   too, everyone likes cake so I can't blame them, I

11   suppose, in that regard.

12                   But beyond that, I was going to say if it

13   helps you take a breath, you should see what comes across

14   my desk.

12:11:46  15        MR. ABREU:  I'm sure, Your Honor.

16                   THE COURT:  Not in this case, don't get me

17   wrong.

18                   MR. ABREU:  No, I appreciate that, Judge.

19                   THE COURT:  All right.  So with that, then,

12:11:54  20   we can move on to the motions to sever.

21                   Again, these are various -- these are

22   called different things by different people.

23                   On this one, Mr. DeVillers, I believe you

24   filed the first one, so happy to hear from you first.

12:12:09  25        MR. DeVILLERS:  So, Your Honor, just to be

1    clear, we don't really see any reason to sever out of the

2    case as defendant other than the statements, and this is

3    what we're concerned about.

4                There are clearly about 30 hours of tapes

12:12:29  5    and text messages and even the statements in the

6    indictment, my client had nothing to do with.  He wasn't

7    part of these.  He wasn't there for them.  He wasn't

8    talking to them.

9                So the question is, you know, is

12:12:41 10    this -- the argument really is that it was not hearsay or

11    it's an exception because it's a statement of a

12    co-conspirator in furtherance of a conspiracy.

13                THE COURT:  I mean, I've read the

14    statements so I understand your argument, and that's

12:12:56 15    fundamentally my question.

16                You, even if you had separate trials, you

17    know, we can talk about that, but, you know, for present

18    purposes we can say we'll try your client first or

19    second, I'm not sure it really matters, don't the

12:13:12 20    statements still come in?

21                MR. DeVILLERS:  I don't believe they do.

22                One, they have to show that there was a

23    conspiracy by a preponderance of the evidence to show

24    that they would come in.

12:13:21 25                THE COURT:  I mean, that would be a Rule

1      104 issue, I suppose.

2                  MR. DeVILLERS:  We could, and that's, quite

3      frankly, I may be expecting some sort of a voir dire or

4      hearing to establish by a preponderance of the evidence

12:13:32  5      that a conspiracy exists.

6                  If we just went into it through a trial, I

7      can't imagine -- you know, Mr. Abreu is a fine

8      attorney -- but doing an opening statement without

9      actually discussing these statements that my client

12:13:44 10      wasn't a part of.

11                  It's not also that there were

12      co-conspirators' statements.  They have to be in

13      furtherance of the conspiracy.  And there are a lot of

14      statements that are both in the indictment and there's

12:13:55 15      text messages and --

16                  THE COURT:  I don't think they have to be

17      in statements that your client makes in furtherance of a

18      conspiracy.

19                  I think the declarant just needs to make

12:14:07 20      the statement in furtherance of a conspiracy.

21                  So under the conditional relevance, the

22      question would be whether Mr. Spivak making the

23      statements -- I believe he made most of the ones in your

24      exhibit that I've reviewed -- if those were statements

12:14:20 25      that were in furtherance of the conspiracy, you know,

1    that I think they would, you know, ultimately I guess I

2    just, you know, even if we were to sever or bifurcate,

3    try separately under whatever nomenclature, aren't many

4    of those statements coming in anyway?

12:14:40  5              MR. DeVILLERS:  I think if you found there

6    was a conspiracy by a preponderance, yes, some would.

7              But there are some even in our motion, I

8    mean there are statements by Mr. Dean, he's certainly not

9    talking in furtherance of the conspiracy, and he's

12:14:51 10   talking about my client and he's making incriminating

11   statements about my client kind of self-serving to some

12   extent that may come in in a trial just with Mr. Spivak

13   to give context to a conversation that wouldn't come in

14   against my client as a furtherance of the conspiracy.

12:15:05 15             So I suppose what, you know, we could -- I

16   agree that it is unlikely these are testimonial

17   statements and that there's a confrontation clause issue,

18   it really purely is an evidentiary issue.

19             And I suppose I can object, but it seems to

12:15:22 20   me that I'll be objecting through opening statements,

21   even if the Court were to find that there was -- there

22   was a preponderance of the evidence suggesting a

23   conspiracy, but there's a lot of these statements that I

24   don't agree that are furthering the conspiracy.

12:15:36 25             And that's what I'd be objecting to the

1    point where I'm not sure that we could have, you know, a

2    trial that's not going to be very, very interrupted.

3                    THE COURT:  All right.  Thank you.

4                    I think I understand your arguments and

12:15:52  5    your position.

6                    Bear with me one second.

7                    You can have a seat, but bear with me

8    before I turn to a co-defendant.

9                    All right.  Thank you.  And thanks for

12:16:16 10    bearing with me for that moment.

11                    I'm pretty sure everyone has filed one of

12    these motions, so I'm not sure who wants to speak next.

13                    MS. KELLY:  We will, Your Honor.

14                    THE COURT:  All right.  You drew the short

12:16:29 15    straw.  Everyone was looking at you.

16                    MS. KELLY:  Your Honor, my name's Melissa

17    Kelly and I'm with the firm of Tucker Ellis, and along

18    with Mr. McCaffrey I represent Olga Smirnova.

19                    I'm talking to you today about the motion

12:16:54 20    to bifurcate Counts 1 and 2 from trial with Counts 48

21    through 50.

22                    You know, the standard for that relief

23    is -- it's in our briefing and I'm sure the Court is

24    familiar with it, as is everyone in this room -- and it's

12:17:08 25    about preventing prejudice, specifically the compromise

1   of a specific trial right or preventing the jury from

2   making a reliable determination as to guilt or innocence.

3             And the danger that's at the heart of our

4   arguments in this motion is spillover evidence which is,

12:17:25  5   you know, the danger that evidence about one count or one

6   set of counts will cause the jury to make an unreliable

7   determination about guilt with respect to the other

8   counts.

9             And here that danger is particularly keen

12:17:39 10   because Ms. Smirnova is charged in the first two counts,

11   the first two conspiracy counts, and her conduct is

12   referenced in Counts 48 through 50, but she's not charged

13   in those counts.

14             And, you know, as you've heard a few people

12:17:52 15   talk about today, the evidence or, excuse me, the

16   allegations in Counts 1 and 2 about Ms. Smirnova are

17   thin.  They're thin at best.  Mr. McCaffrey talked about

18   that with respect to Count 1.

19             You can read through Count 2 and see that

12:18:05 20   it relies on a series of recorded meetings that

21   Ms. Smirnova was at, you know, three of them; she was

22   there with her daughter.  She was tending to her

23   daughter.

24             That's all covered in the briefing, and I

12:18:16 25   know that the Government said a few moments ago that

1    there's a lot, you know, more evidence with respect to

2    the text messages that form the basis for Count 1, but

3    that doesn't necessarily weaken or affect our argument.

4                Our argument still holds because the three

12:18:35  5    final counts invite the jury to conclude that

6    Ms. Smirnova engaged in illegal conduct, and that's

7    particularly precarious for her in this case because

8    Count 48 is a conspiracy count against her husband Paul

9    Spivak.

12:18:51 10                And in Paragraph 56, Page 40 of the

11    indictment, the Government alleges that Mr. Spivak

12    conspired to construct justice -- obstruct justice,

13    excuse me, with unnamed conspirators, and then it's

14    followed by a discussion of Ms. Smirnova's conduct.

12:19:09 15                And I found it sort of interesting a few

16    moments ago, the Government actually referred to Counts 1

17    and 2 and 48 in the same breath, the conspiracy counts.

18    So I think that demonstrates the sort of, you know, risk

19    that we are talking about here, and that is that --

12:19:24 20                THE COURT:  Why would a jury instruction

21    not suffice to protect the interests of your client in

22    this regard?

23                I mean, I think that's normally how we deal

24    with these sorts of issues.

12:19:38 25                MS. KELLY:  Sure.  You're absolutely right,

1      Your Honor.

2                    And I'm sorry, I didn't know if you were

3      done.

4                    THE COURT:  Yeah.

12:19:43   5         MR. KELLY:  That's absolutely right, and

6      that's certainly the statement that the two cases that

7      the Government cites in response to our argument stand

8      for.

9                    But I think in this case, the specific

12:19:52  10    danger with respect to a jury instruction is the fact

11     that Count 48 is a conspiracy charge.  And it's a charge

12     of conspiracy against Mr. Spivak, and -- who is her

13     husband, my client's husband, and she is also charged

14     with conspiring with him in the first two counts.

12:20:10  15         So the danger is while she conspired with

16     him, you know, in this -- she must be the person who

17     conspired with him or one of them in Count 48 so she must

18     have also conspired with him with respect to Counts 1 and

19     2.

12:20:23  20              And that, that's where the sort of novel

21     danger in this case arises that doesn't guarantee that a

22     jury instruction would prevent the prejudice that we're

23     talking about.

24                   And actually, Your Honor, if you look at

12:20:37  25    the cases that we've cited in our brief, they sort of

1    support that same kind of thinking.

2              And even the cases, I know we cited a

3    couple of cases where the relief we were requesting was

4    not granted, but that's because those cases, they sort of

12:20:51 5   demonstrate the line between the relief being merited and

6    the relief not being merited.

7              And I think a good example of that that is

8    particularly applicable to this case is *Emond* or *Emond*.

9    It's a Seventh Circuit case from 1991 that's cited in our

12:21:06 10  brief.  It's a RICO case.  It was a village manager and

11   his wife.  The village manager was charged with numerous

12   offenses involving his misconduct while he was in his

13   position, and he and his wife were both charged with tax

14   evasion, and they wanted to separate the tax evasion

12:21:21 15  counts out.

16             The District Court denied and the Seventh

17   Circuit ultimately affirmed that decision.  But it noted

18   that it thought that the District Court was sort of maybe

19   at the outer limits of its discretion in denying that

12:21:36 20  relief.

21             And one of the things that the Court said,

22   you know, this is the reason that we aren't finding error

23   here and that is the strength of the counts against the

24   wife, so we aren't so concerned that there was jury

12:21:50 25  prejudice here.

1          And that is not, you know, our position, of

2     course, is that that doesn't apply because of the

3     thinness of the allegations, at least, against

4     Ms. Smirnova.

5          And that Court also took a moment to

6     discuss Ms. -- the wife's, excuse me, the wife's argument

7     that if you do a jury instruction in this instance, you

8     know, first of all, there's always the danger that, on

9     repetition, jury instructions lose their effect, but it

10     also said, the Court also recognized the argument that,

11     you know, if the Court's giving these instructions about

12     the wife who was alleged to have engaged in behavior or

13     conduct, excuse me, with her husband, and you tell the

14     jury that it can't consider that, it piques its interest.

15          And I think particularly in a case like

16     this one where you have a conspiracy charge in Count 48

17     and two conspiracy charges at the top of the indictment,

18     and the jury's going to, "Well, what's going on, now we

19     got to think about it," and I think that presents a

20     particular danger in this case.

21          THE COURT:  Yeah, I understand that

22     concern.

23          That's not been my experience with juries.

24     After every trial, I talk with the jury, it's one of the

25     two best parts of the job, and they take the instructions

1    pretty seriously in my experience.

2                    MS. KELLY:  Sure.

3                    And I certainly wasn't denigrating, you

4    know, what juries do.

12:23:05  5                    THE COURT:  No, I didn't hear you to be

6    saying that.

7                    I'm commenting more on the argument itself,

8    and I didn't take you to be denigrating.

9                    MS. KELLY:  Oh, okay.  Thank you, Your

12:23:13  10    Honor.

11                    But I think in particular in this case,

12    because -- and I don't mean to sound like a broken

13    record, but we've got conspiracy with husband and wife at

14    the end and conspiracy with husband and wife at the top,

12:23:23  15    and I think that that creates a situation where a jury

16    might potentially give less heed to the Court's

17    instruction about this issue.

18                    THE COURT:  I'm still working through the

19    arguments on these various motions and thinking about

12:23:38  20    them and the like.

21                    So I'm going to ask you a question and

22    don't take it as this is, like, where I'm going or

23    anything.  It's just something I've been kicking around,

24    and let me get your thoughts on it.

12:23:51  25                    It's occurred to me that one way to deal

1    with this issue would be to try these counts separately

2    which would be to say we'll have one jury, because I

3    think the Seventh -- I'm sorry -- the jury trial right in

4    the Sixth Amendment and under Article III is for one

5    jury.

6              So we would just simply -- I don't -- if we

7    go down this path we'd have to talk about what the

8    jury -- what the proof would look like on these counts,

9    but it doesn't strike me as, you know, as an evidentiary

10   matter; we're talking about three additional days on

11   these counts or anything.

12             I think you would have a jury come back,

13   return whatever verdict it returns, Counts 1, 2, and the

14   related substantive charges, and then say, "Ladies and

15   Gentlemen, one more thing we need you to do.

16             "We've got a couple more witnesses we need

17   you to listen to, you'll be out of here tomorrow," or

18   whatever the time frame is, and then try these counts

19   separately.

20             That seems to me at least -- I'm kicking

21   that around.  There might be some practical

22   considerations in terms of witness availability and so

23   forth.  There might be some other issues I'm not thinking

24   about.  I'm sure there are.

25             But it seems to me that there's no

1    prejudice to your client or any others in that world.

2                MS. KELLY:  Well, I can tell Your Honor

3    that one of the cases that we cite in our brief, *Moore*

4    from the Northern District of Michigan, that's exactly

5    what the Court did.

6                That case, I mean it was really different

7    circumstances.  One of the counts was a felon in

8    possession, and the other counts were unrelated to that.

9    And so the Court had the trial on the substantive other

10   counts, and then it had, same jury, a trial on the felon

11   in possession.

12               So that's certainly something that would be

13   within the Court's discretion to do.

14               And, you know, in terms of the prejudice

15   that we're concerned about, so long as, you know,

16   evidence about Ms. Smirnova's conduct as alleged in

17   Counts 48 through 50 didn't come in --

18               THE COURT:  I mean, presumably it wouldn't

19   come in on the other counts.

20               MS. KELLY:  Sure, Your Honor.

21               And that actually goes to the Government's

22   second argument which is a 404(b).  The Government says

23   in its brief that evidence about Ms. Smirnova's conduct

24   with respect to those final three counts will be

25   admissible to show consciousness of guilt, intent and

1    knowledge.  That's on Page 14 of their brief under

2    404(b).

3                   It doesn't really develop that argument,

4    and I think it might be because the Government would be

5    hard-pressed to do that.

6                   The conduct that's at issue in Counts 48

7    through 50, they just don't have any bearing on those

8    issues with respect to conspiracy to commit securities

9    fraud.  They happened while her husband was in detention.

10   They relate to that issue.

11                  I'm not certain how, you know, recorded

12   conversations with her husband where he's telling her,

13   you know, "Make sure that the agents who are coming to

14   search our house can find the weapons," and she's telling

15   him, you know, "Let's wait to see what your attorney

16   says, let's do what your attorney says," have any bearing

17   on the issues that make other acts evidence admissible

18   under 404(b).

19                        THE COURT:  All right.  Thank you.

20                        MS. KELLY:  Thank you, Your Honor.

21                        THE COURT:  Other, other defendants?

22                        Mr. Rosen?

23                        MR. ROSEN:  Yes, sir.

24                        Maybe three trials in front of the same

25   jury.

1          Your Honor, we are moving for a severance,

2     a relief from prejudicial joinder under Rule 14 for

3     between Counts 1 and Count 2 along with substantive

4     Counts 8, 9, 10, 29, 30, 31, 32 and 33.

12:27:45  5          Those are the substantive counts of either

6     transactions or wire, wire fraud.

7          And, Judge, as I think through my argument

8     to the Court on this, I'm going to ask Your Honor to have

9     both the practical aspect of my argument in front of

12:28:07 10     twelve jurors and the legal side to this issue because I

11     think in certain ways they are sort of inseparable.

12          How is a jury going to be able to

13     conceivably distinguish between evidence where a

14     defendant is not charged but a charging document

12:28:30 15     incorporates into the Count 2, where Mr. Bongiorno is not

16     charged, allegations, and then the jury is supposed to

17     hear all of this?

18          So there's a practical and a legal approach

19     to this.

12:28:43 20          THE COURT:  Well, why isn't -- I have the

21     same question.

22          Why isn't a jury instruction at the end of

23     the day sufficient to protect Mr. Bongiorno's interests

24     in front of a jury on that?

12:28:58 25          MR. ROSEN:  Well, because it's impossible.

1         It's -- I respect this Court's statement

2    that a jury does follow -- and I reference *Bruton* in my

3    case not for the confession aspect of it, but if I may

4    just turn for a moment to my notes on that -- the effect

12:29:23  5    of a nonadmissible declaration cannot be wiped from the

6    brains of the jurors.  Every piece of evidence pertaining

7    to Count 2 will be virtually identical, if not identical.

8              THE COURT:  It's a different time period.

9              MR. ROSEN:  But-for the time period.

12:29:48 10              THE COURT:  I mean, that's a pretty

11    important difference.

12              MR. ROSEN:  It is.

13              THE COURT:  I mean, I think -- I think a

14    jury would understand time travel.

12:29:54 15              MR. ROSEN:  So here's my -- here's my

16    response then because that is the singular distinction.

17              Now I'm going to go to the practical side

18    of this.  If these folks are going to be taking notes, or

19    not and just listening --

12:30:10 20              THE COURT:  I allow them to take notes.

21              MR. ROSEN:  Yes, sir.

22              I've given up objecting to that.

23              THE COURT:  You can object.  It's

24    overruled.

12:30:19 25              MR. ROSEN:  Fair enough.

1          Because the same witnesses, the same

2     allegations, the incorporation of Paragraphs 26, 27, 29,

3     33, 34, 35, 38 and 41 are incorporated into Count 2,

4     which Mr. Bongiorno is not charged, and overt acts FF,

12:30:58  5     GG, HH, II, JJ, KK, NN, OO, RR and EEE.

6               THE COURT:  We're going to have to talk to

7     the U.S. Attorney's Office about that numbering system.

8               MR. ROSEN:  Seventeen different criminal

9     allegations of fraudulent conduct are being introduced in

12:31:24 10     this trial having nothing to do with Chris Bongiorno.

11               Seventeen criminal, different criminal

12     allegations in the same case where he is charged in

13     virtually identical conduct, and you're going to ask this

14     jury to remember, to notate the distinction and dates, I

12:31:50 15     think puts an undue pressure and undue practicality.

16               THE COURT:  Well, in addition to the jury

17     instruction, doesn't trial practice protect your client

18     on that in the sense that -- and I don't know how -- I

19     mean, you're all going to have to try your cases if we

12:32:08 20     have, you know, one or more trials or however that all

21     unfolds remains to be seen, but for the sake of argument

22     here, I would assume at trial -- again it's your case,

23     it's your client, you can do what you want -- but I would

24     assume that when there's a witness on the stand, you're

12:32:23 25     going to stand up and cross-examine the Government's

1    witness and emphasize, as long as I'll let you do it, you

2    know, to the jury that this doesn't have anything to do

3    with your client on Count 2.

4                And so now you have the jury instruction

5    reinforcing what they sat through, you know, for a day, a

6    week, two weeks, whatever it is, and they're remembering

7    you doing that, they're checking their notes, they're

8    seeing that, and they have the jury instruction.

9                I guess I think about all of that, and I

10   wonder why that doesn't accomplish what you're seeking to

11   accomplish through the motion.

12               MR. ROSEN:  Because I think the Court is

13   asking more than the human brain, the human juror sitting

14   in a courtroom is going to be able to accomplish.

15               It's -- if there was a distinction in the

16   nature of the allegations -- and, Judge, just as an

17   example because it doesn't affect me -- if you were to

18   look at the obstruction counts which I have not moved to

19   sever, and you say "Now, Ladies and Gentlemen, these

20   counts, this evidence is not coming against

21   Mr. Bongiorno, he's not charged in this count," and then

22   the Government produces its obstruction evidence, you

23   have a very clear ability, a clear line of information

24   that's going into a jury's head.

25               But two points.  One, it's so identical

1    that I think asking the juror to remember and to

2    segregate, I mean are we going to stop every witness and

3    say, "Now, this question only pertains to 21 and 22; not

4    19"?  That's not going to happen.  It's just going to

12:34:07   5    come in.

6            And they are going to be assessing the

7    culpability of four individuals.  Their job is to assess

8    each person's guilt or innocence, the Government's proof

9    as to each person's guilt or innocence, and then

12:34:24  10    segregate out from the same witness the time parameters

11    when, in fact, the conduct's going to be alleged the

12    same.

13            But more than that, and I think this may be

14    the legal side to this argument because the Court's

12:34:36  15    asking me about the practical side:  This indictment is,

16    in my judgment, fatally flawed because of how it

17    incorporates into Count 2 the previously described

18    paragraphs that is going to go back to the jury.

19            I mean, it's not evidence, but they're

12:35:03  20    going to have this indictment.

21            THE COURT:  I don't know about that.

22            I actually haven't ever sent an indictment

23    back --

24            MR. ROSEN:  Okay.

12:35:11  25            THE COURT:  -- to the jury.

1           I mean, I'm open to doing that if --

2                MR. ROSEN:  Well, my experience is Courts

3      have done that.

4                THE COURT:  Subject to discussion.

12:35:22  5                MR. ROSEN:  And again to my point --

6                THE COURT:  I also haven't tried an

7      indictment that's 60 pages long, so there's a first time

8      for everything.

9                MR. ROSEN:  It's a lot, Judge.  It's a lot

12:35:34 10     of allegations.  It's a lot of conduct.  And that sort of

11     bleeds into my observation of I don't think it's

12     possible.

13           I mean, look at the *Bruton* case.  They

14     basically are acknowledging there are some things that

12:35:46 15     just cannot be reasonably expected of a juror.  And

16     because not only do the allegations in Count 1 get

17     incorporated into Count 2, but the testimony's going to

18     be identical.

19                THE COURT:  Just so I'm clear, what you're

12:36:02 20     seeking in your motion is to try Count 1 and Count 2

21     separately?

22                MR. ROSEN:  Yes, sir.

23                THE COURT:  Yeah.  Okay.

24                As I understand it, it just read large on

12:36:12 25     the defense side.  We have every -- we have every motion

1    just about every which way.

2              MR. ROSEN:  Let me see if there's --

3              THE COURT:  That's good.  I just want to

4    check them all off.

12:36:23  5              MR. ROSEN:  That's fine.

6              THE COURT:  They're on my criminal

7    procedure bucket list.

8              MR. ROSEN:  I had cited two Sixth Circuit

9    cases.  Let me just summarize each of them.

12:36:35 10              THE COURT:  Sure.

11              MR. ROSEN:  The *Soto* case, which is on

12   Page 3 of my motion, they look to the following to

13   determine improper prejudice:  Was the evidence

14   intertwined; similarities and differences between the

12:36:49 15   evidence; the strength of the Government's case; and the

16   ability to separate the evidence.

17              I'm the first to acknowledge the obvious

18   which is it's a different time frame, but it's asking the

19   jury to, every time it hears a sentence from a witness

12:37:06 20   about an event, to segregate as to each of these

21   allegations, for I don't know how many weeks, these two.

22              And I think when they get back to that jury

23   room, it's going to be, "When was that again?"  And I

24   would expect them to write down the date of each line of

12:37:25 25   testimony and when that comes in because they're so

1    identical.

2              The other -- the other case I cited was the

3    *Davis* case.  Joinder is not prejudicial, not prejudicial,

4    if, had two counts been tried separately, the evidence on

12:37:40  5    each count would have been admissible in the other trial.

6              None of this evidence is admissible against

7    Mr. Bongiorno as to Count 2 because it is a separate

8    date, but the ability of a juror for a period of weeks to

9    hear the same witness talk about the same acts and then

12:38:02 10    expect them to be able to, in the back when they're

11    deliberating, bring back a fair and reasonable verdict,

12    we're never going to know.

13              Not that the Court couldn't instruct them.

14    I just think it's to my first point, it's going to be

12:38:17 15    impossible.

16              Thank you, Your Honor.

17              THE COURT:  All right.  Thank you.

18              MR. AXELROD:  Your Honor, if I could just

19    briefly address the last severance argument.

12:38:22 20              THE COURT:  Sure.

21              MR. AXELROD:  We did not file a motion to

22    sever on behalf of Paul Spivak.

23              THE COURT:  I was mistaken.

24              MR. AXELROD:  No, we did not.

12:38:28 25              We did not.

1              But --

2              THE COURT:  Did you move to join all of the

3     other ones?

4              MR. AXELROD:  We did not do that either, of

12:38:35  5     course, because I'm hoping, and I believe that the motion

6     should be dismissed, but -- the motion should be granted

7     and the case should be dismissed.

8              But today and hearing Mr. Abreu and, in

9     fact, a question Your Honor asked raises a really

12:38:48 10     important point.  If the Government seeks to establish

11     predisposition for Count 2 based on Count 1, that creates

12     a significant problem for Mr. Spivak.

13              Sixth Circuit jury instruction 2.01A is

14     about separate consideration for a single defendant

12:39:07 15     charged with multiple crimes.  And of course, you know

16     this, it instructs the jury that each count is to be

17     considered separately.

18              However, if Your Honor charges -- if Your

19     Honor tries Counts 1 and Counts 2 together, the

12:39:20 20     Government will be arguing, "Jury, you should convict on

21     Count 2 because of what Mr. Spivak did on Count 1,

22     because of predisposition," which will go against the

23     jury instruction, the pattern jury instruction, which

24     will allow the Government to buttress Count 2 because of

12:39:38 25     Count 1, and then, of course, they'll buttress Count 1

1      because of Count 2.

2                       So it's just a lot of bootstrapping, which

3      I think is improper.

4                       I think the cleanest thing to do is to try

12:39:48  5      Count 1 altogether.  Every defendant here is involved in

6      that case should the Government -- should Your Honor

7      decide not to dismiss it, which I think you should.

8                       And then of course, dealing with the

9      practicalities of that, if Mr. Spivak is convicted on

12:40:01 10      Count 1, of course the predisposition argument, I'm not

11      going to prejudge it, but probably goes away for Count 2.

12                       However, the flip side is if he's

13      acquitted, it probably also goes away.

14                       So it's a very clean way of avoiding

12:40:19 15      significant spillover prejudice between Count 1 and Count

16      2 for Mr. Spivak, and potentially gaining efficiencies

17      for the Court.

18                       Thank you.

19                       THE COURT:  All right.  Thank you.

12:40:28 20                       Mr. Abreu.

21                       MR. ABREU:  Thank you, Your Honor.

22                       Your Honor, just because I'll probably

23      forget what I was going to say, I'll address that last

24      point first.

12:40:40 25                       The Government isn't going to try to prove

1    that Mr. Spivak was predisposed to commit a crime with

2    Count 1 unless they raise the defense that he was

3    entrapped and he's not predisposed, and we have to do

4    that.  Right?

12:41:02   5              That's what your Honor was warning them

6    that they would be inviting a problem for themselves if

7    they were to raise this defense, and they should consider

8    that.

9              That's a problem that they would create.

12:41:11  10              That's not a -- the two counts can stand on

11   their own.  The evidence is sufficient for both counts.

12   But if they say that Mr. Spivak is not predisposed to

13   commit securities fraud, then the evidence from Count 1

14   rebuts that.  But that's something that they would

12:41:31  15   invite.  That would be an invitation on their part.

16              Going back to Mr. Scott, Mr. Scott's motion

17   relative to the statements made by Mr. Spivak, you know,

18   I think what that really boils down to is a 403 argument,

19   that the statements are so prejudicial that they, you

12:41:54  20   know, outweigh any probative value, and then I think it's

21   a premature stage to consider that.

22              I think that's a motion in limine issue.

23   And I don't think that the statements are unduly

24   prejudicial.  They are prejudicial.  Every piece of

12:42:12  25   evidence that I'm going to introduce against the

1    defendants is prejudicial.

2              THE COURT:  I would hope so.

3              MR. ABREU:  Right.

4              THE COURT:  Otherwise, I would question

12:42:19 5    whether it's relevant.

6              MR. ABREU:  Right.

7              But the question is is it so unduly

8    prejudicial when a co-defendant is making statements in

9    furtherance of the conspiracy?

12:42:27 10              If there are disputes about that and

11    particular statements, I think that that's better handled

12    closer to trial in a motion in limine, and can be

13    addressed either by the Court excluding particular

14    statements or certain kinds of redactions.

12:42:45 15              The Government has done that in other cases

16    for *Bruton* issues.

17              It doesn't require severance for the

18    defendant.

19              Relative to Mr. Bongiorno, actually I'll go

12:43:07 20    back to Ms. Smirnova because I think she was -- she was

21    the second defendant to -- her argument was second.  I

22    guess hopefully I can cure the prejudice right now and

23    say that I will tell the jury that she is not a

24    co-conspirator in Count 48.

12:43:24 25              She wasn't charged in that count because

1    she clearly told her husband, "Kevin Spellacy said not to

2    talk to that guy, I don't want to talk to him, I don't

3    want to say anything to him, you shouldn't say anything

4    to him, you shouldn't have people say anything to him."

5                    That's why she wasn't charged, she's not a

6    member of that conspiracy.

7                    I don't -- now, the Count 50 issue about

8    the computers and why the -- her knowledge of the

9    computers is probative is because she knows what a

10   computer from the Richard Mallion days contains, evidence

11   of securities fraud.

12                   That's why it's relevant.

13                   But I have no intention of asking the jury

14   to convict or try to confuse the jury into convicting

15   Ms. Smirnova with a crime she didn't commit.

16                   She was -- I actually, when I listened to

17   that jail call, I applauded for her because I was like

18   she's a lot smarter because she's following, you know,

19   Mr. Spellacy's advice.

20                   And that's important because Mr. Spivak

21   plows right through that, says, "Okay, okay, yeah, I'll

22   listen to that," and then makes a call two minutes later

23   to Anthony Corpora telling him to go talk to the witness

24   again.

25                   I think the jury is not going to be

1      confused.  I think that if anything, it's to

2      Ms. Smirnova's benefit to show that she did not commit

3      that crime.

4                  And as to Mr. Bongiorno --

5                  THE COURT:  I mean, I suppose the risk

6      there is a jury hears a statement of one defendant who

7      happens to be married to another, and to kind of

8      Mr. Bongiorno's point doesn't, in the course of a lengthy

9      trial, doesn't draw these fine lines, and I take your

10     point, but they may not see it the same way you do.

11                 They may say that, "We don't -- we don't

12     like what Spivak is saying here, for example, and, you

13     know, they're a married couple so, you know, they rise

14     and fall together."

15                 MR. ABREU:  That would -- that would

16     require them to do something illegal because the Court

17     would be giving an instruction for them not to do that,

18     and I don't think that the legal standard is that we

19     would presume that the jury is going to disregard the

20     Court's instructions and the evidence that's going to be

21     presented at trial that's going to be clear, and

22     counsel's arguments.

23                 I know it doesn't matter what I say right

24     now and that anything I say at trial isn't evidence, but

25     there's -- we're not running from the facts on this.

1   There's ample evidence to convict Ms. Smirnova of Count 1

2   and Count 2, and she did the right thing with respect to

3   Count 48.

4               I have no issues telling the jury that, and

12:46:37  5   I don't think they are going to be confused or hold it

6   against her that her husband plowed through and did that

7   anyway.

8               THE COURT:  What about trying Count 1 and 2

9   separately?  I mean, they're different time periods.

12:46:52  10   They're complicated financial transactions with a lot of

11   wire transfers and recordings and so forth.

12               And in terms of just keeping the evidence

13   straight and keeping the jury focused on what's in front

14   of them, why not try those separately?

12:47:10  15               I appreciate that there's some efficiency

16   issues there, but I mean if we're being honest about it,

17   this is not the most efficient dispute resolution system

18   in the world, so there's other values.

19               But why not try them separately?

12:47:24  20               MR. ABREU:  Well, I mean, that's a fair

21   point, Judge, because I think I haven't decided how the

22   Government's case, we would present a case, but typically

23   based on the way we've charged this case, we would be

24   presenting evidence on Count 1 first and then we would

12:47:43  25   switch to Count 2 where we generally try to be very clear

1    about which count we're introducing evidence on,

2    especially at opening and how we organize our witnesses.

3              Do I think that -- but I don't think that

4    we need to, you know, submit all the evidence on Count 1,

12:48:03  5    stop, have a verdict, proceed on Count 2, stop, have a

6    verdict, and then continue to the rest of the counts.

7              THE COURT:  Well, might that not be more

8    efficient in some way?  I mean, it's possible.

9              I mean, you all are far closer to both the

12:48:22 10    facts and where your respective clients are at, but it's

11    possible if the jury returned a verdict one way or the

12    other on Count 1, that we don't need to try the rest.

13              It might be that there's pleas or it might

14    be that DOJ walks away from Count 2 or just, you know,

12:48:37 15    maybe the defendants don't -- maybe it doesn't matter any

16    more.  Maybe, you know, if the predisposition issue goes

17    away, I don't know, anything can happen.

18              You give a jury a day off and come back and

19    maybe they don't need to come back.

12:48:54 20              I mean, I'm just thinking out loud.  I

21    don't have a view.

22              MR. ABREU:  Right.

23              THE COURT:  Like I said, I'm working

24    through these issues.

12:49:00 25              MR. ABREU:  Your Honor, I thought about the

        1   same issue with respect to the obstruction counts, so 48,

        2   49 and 50.

        3                  THE COURT:  Right.

        4                  MR. ABREU:  If we were to do the case that

12:49:12   5   way.

        6                  I think, although not my preference to do

        7   it that way, I think that, you know, that is probably,

        8   out of all of the arguments that have been made by

        9   defendants, that's probably the one with the most merit.

12:49:25  10                  THE COURT:  That's high praise from where

       11   you sit.

       12                  MR. ABREU:  But again, I don't think it's

       13   necessary because I don't think the defendant, the other

       14   defendants are going to be prejudiced by it.

12:49:40  15                  But I think that separating Count 1 from

       16   Count 2 would present different kinds of issues because

       17   when would jeopardy attach, right?

       18                  So if the jury came back with a not guilty

       19   on Count 1, not that I would do this, but the United

12:49:57  20   States may dismiss without prejudice Count 2 just to

       21   refile it because I want a different jury.

       22                  I could see, you know, that could be

       23   something that would happen.  I don't think that's fair

       24   to the defendants.  I don't think that's particularly

12:50:15  25   efficient or what is intended in our criminal justice

1       system.

2                    You know, if we're going to have one jury,

3       then we would want one jury to decide all of the issues.

4       But if we sort of take it piecemeal, it would be

5       problematic because different rights wouldn't attach all

6       at the same time presumably because that trial for Count

7       2 wouldn't have started.  And maybe it's not me sitting

8       up here for the Government who -- and it's someone, you

9       know, who just wants to win, and they make a different

10      decision, or, you know, it unfairly pressures a defendant

11      to plead guilty when they otherwise wouldn't.

12                   You know, I could see a host of issues that

13      would be problematic by separating out the counts like

14      that.

15                   THE COURT:  There's nothing but difficult

16      issues on every side.

17                   You know, when you sale the ship between

18      Scylla and Charybdis, that's what you face.

19                   MR. ABREU:  True, Your Honor.

20                   Thankfully, I don't believe most of this is

21      difficult.  But I do see some merit in the obstruction

22      argument by moving that out, but the fact is Ms. Smirnova

23      wasn't involved in the conspiracy to -- you know, she's

24      not a co-conspirator in Count 48.  That can be explained

25      to a jury without a problem.

1          I don't think there's really any prejudice

2     there.

3          And everything else can be cured by a jury

4     instruction.  I mean, as to Mr. Bongiorno, the

12:51:59  5     incorporation of his name in allegations in an indictment

6     that doesn't go back to the jury, I mean there's not

7     going to be any evidence presented to them that he was

8     involved in any conduct from 2020.

9          It's -- it would have no prejudicial effect

12:52:15 10     on him, and so there isn't a reason to separate a trial

11     for him or have a separate trial for him.

12          Thank you, Judge.

13          THE COURT:  All right.  Thank you.

14          I believe we're down to one, one last

12:52:38 15     motion.

16          Did you need a break?  All right.  Why

17     don't we -- our court reporter is requesting a break so

18     why don't we take -- it's 12:50.  Why don't we take a

19     10-minute break?

12:52:52 20          We're down to one motion, so we're knocking

21     them out.

22          We'll resume shortly.  Thank you.

23          THE CLERK:  All rise.

24          (Recess taken.)

13:15:10 25          THE COURT:  Please be seated.

1          All right.  So now that we've had our

2  break, we're good for another three hours on the last

3  couple motions.

4             MR. ROSEN:  I'll stay under that time,

13:15:21 5  Judge.

6             THE COURT:  It's a high bar.

7          All right.  Go ahead.

8             MR. ROSEN:  All right, Your Honor.  This is

9  on DE 287, Mr. Bongiorno's motion to suppress.

13:15:29 10          On July 7th, 2023, at the U.S. Virgin

11  Islands St. Thomas airport Mr. Bongiorno was arrested.

12          I've listed several times what he was

13  carrying.  I don't need to do it again.

14          It's from the face sheet of my pleading.

13:15:51 15  Upon information and belief, and I think I heard from the

16  Government today, that the arrest was based upon the

17  return of the second superseding indictment which is what

18  I had assumed.

19          And again, further based upon information

13:16:07 20  and belief, Judge, as I stand here today, there was no

21  probable cause to search -- to seize any of the items

22  based upon criminal conduct at the time.  He was merely

23  going to the airport to come to Miami.

24          I think maybe Ft. Lauderdale, actually.

13:16:27 25          There were no exigent circumstances.

1    Certainly no consent, and to my knowledge no search

2    warrant.

3              And further, no probable cause to believe

4    that evidence was contained in the items that he

13:16:41 5    was -- evidence associated with this case was obtained in

6    the items he was carrying.

7              Judge, the indictment in this case, the

8    last overt act, the last day of the alleged Count 1

9    conspiracy, as best I could tell, was September 24th,

13:17:02 10   2019.  The last overt act by Mr. Bongiorno was 2016.

11             So if we were to take the end of the

12   conspiracy, by my count, 1,182 days had passed between

13   the date of the close of the criminal conduct and the

14   date of the seizure of the items at issue.

13:17:27 15            So there can really be no serious argument

16   asserting a causal connection between the crimes charged

17   and the seizure of these personal items.

18             And because his wife was standing there, he

19   could have, had he been given the opportunity, to give to

13:17:45 20   her all these items that the Government took.

21             The Government's response to the motion, as

22   I try to assess it, my sense was a greater degree of lack

23   of clarity is hard to imagine.

24             The Government's response was the

13:18:14 25   Government has not accessed the user-generated -- let me

1    stop.  Let me back up a second.

2              So as to -- before we get into the content

3    of this, as to the seizure itself, Judge, in my view it

4    is a hard stop at that point.  They have no legitimate

5    basis then or today to have taken or retained these

6    items, but they have.

7              And so I think there is some hard questions

8    that the Government should answer today to this Court

9    such as what, what was the basis for the initial seizure?

10   Why was it taken?  Because all of this, I think it will

11   help the Court assess where do we go from here.

12             Was there a search warrant obtained for the

13   seizure of these items?  I don't know.  Who seized these

14   items and why?  I think these are questions the

15   Government should answer to assist the Court in

16   determining where we go.

17             And from that moment when it was taken

18   without any legal basis to do so, the Government should

19   have returned these items.  And I'll just direct the

20   Court to docket entry 249, the defendant's notice of

21   discovery request, wherein we filed a demand for the

22   return of these illegally seized items.

23             No response.

24             So in response to our motion to suppress,

25   the Government states that it intends -- "As the

1    Government" -- I'm sorry, let me read the whole sentence.

2              "After counsel for defendant Bongiorno and

3    the United States discussed the defendant's

4    motion" -- and this was done in private between Mr. Abreu

13:20:27  5    and myself -- "it is his understanding," Mr. Abreu's

6    understanding, "that defendant intends to withdraw the

7    motion, as the Government has not accessed the

8    user-generated content of the devices and has no

9    intention of using anything from his seized

13:20:46 10   device/devices in this case, even if it had."

11             My response to that was if, if the items

12   had been taken and held in a locker and stayed there, and

13   the Government said, "Look, we're not going to use this

14   in this case, no one has looked at it, no one has touched

13:21:15 15  it, no one has done anything with it, here's the chain of

16   custody," all that information, I don't think the motion

17   to suppress would be well-founded because it was

18   untouched.

19             And I would have then filed a motion for

13:21:28 20  return of illegally seized property, meaning you can't

21   hold that which you shouldn't be allowed to have because

22   you took it unlawfully.

23             But that wasn't the response.  The response

24   was, as I just read it.  "The Government has not accessed

13:21:45 25  the user-generated content."  And I'm not even sure I

1     know what that means except they -- well, let me

2     finish -- "of the device and has no intention of using

3     anything from his seized devices in this case, even if it

4     had."

13:22:01  5                    To me, this means the items have been

6     seized without a warrant or probable cause, and the

7     devices have been opened.

8                    That's what this says.  The devices have

9     been opened.

13:22:15 10                    So I think the second question that the

11     Court needs to ask, after finding out what the basis was

12     for taking it and by whom and why, is what's happening to

13     that.

14                    Mr. Abreu's response, essentially,

13:22:32 15     acknowledges that it's been opened.

16                    All the Government had to say was, "I found

17     out that these items were seized.  I told them to lock it

18     up, leave it there.  No one's touched it.  Now, let's

19     deal with it."

13:22:50 20                    But that's not what the Government says, so

21     I think we need to find out what's happened.

22                    Because then the question becomes if

23     somebody has opened it, why, based upon what lawful

24     authority, and what have they done with it?

13:23:05 25                    There's a pending criminal case.

1          This seems to insinuate that there may be

2     another investigation, but what's the lawful basis for

3     that?  Hence, my motion for return of illegally seized

4     evidence.

13:23:23  5          THE COURT:  My recollection is that this

6     issue was discussed one time previously, and I believe --

7     and I don't know if the record is the same, we'll hear

8     shortly -- that Mr. Abreu indicated that at trial, the

9     Government had no intention of using any evidence from

13:23:39 10     any of the devices.

11          If that remains true, then the question I

12     have regarding the motion to suppress doesn't necessarily

13     bear on the motion to return the property.

14          But with respect to the motion to suppress,

13:23:52 15     would there be standing to raise the motion?

16          And I think technically under the law it's

17     a standing question, although I think as a matter of

18     Federal Courts' practice it's probably more of a

19     justiciability issue than standing.

13:24:09 20          MR. ROSEN:  If the Government has opened

21     this device, I think the Court's obliged to find out what

22     it is that has happened since then.

23          It isn't necessarily -- let me back up.

24          We have information, Judge, that this

13:24:36 25     device was at least on, if not opened, in Puerto Rico on

1    July 14th, 2023, seven days after it was seized.

2               We believe that based upon this device's

3    information -- when I say "this device," Judge, let's be

4    clear.  There were two phones.  There was a laptop.

5    There were documents.  There was a voice recorder.

6    That's what was seized, so I do not know what has been

7    opened and looked at.

8               Mr. Bongiorno and Mr. Bongiorno's wife's

9    Apple ID has been accessed and subpoenaed.  Bank records

10   have been subpoenaed.  Google records have been

11   subpoenaed.  All of this following a grand jury

12   indictment.

13              So if the Government has been in that

14   device and the Government has accessed information, I

15   think this Court needs to be sure that, in fact, none of

16   this information has gotten into this case.

17              And I accept Mr. Abreu's representation,

18   all right.  But I think, based upon what a continuing

19   investigation -- if that investigation -- if there is a

20   continuing investigation by Mr. Fry, as an example -- and

21   I don't know that that's the case; he's been the case

22   agent in this case from the beginning -- what has -- what

23   has -- what information is it that they've obtained?

24              How are they going to not use that in this

25   case?  What --

1          THE COURT:  I guess from the standpoint of

2     the first motion regarding this issue, I'm not sure I see

3     it any differently than any item not turned over in

4     discovery.

5          Right?

6          Like presumably, if the Government intends

7     to introduce evidence at trial or moves to do so and it

8     hasn't -- it's not part of those two to four terabytes, I

9     assume everybody on this side of the room is going to

10    jump up and raise, you know, any number of complaints to

11    high Heaven.

12         I would have no intention of allowing that

13    evidence.

14         So I'm not sure, you know, to go back to my

15    original question, if the Government is not -- I'm not

16    sure I even need to get into this issue from an

17    evidentiary standpoint.

18         And is it, whether you call it standing or

19    something else, if the Government is not, in fact, going

20    to be using any data removed from any device that was

21    seized with or without a warrant and so forth, does

22    that -- I mean, what is there really for me to decide if

23    they're not going to do that?

24         MR. ROSEN:  I think there needs to be

25    certainty that that's the case.

1        And it isn't necessarily -- Judge, it isn't

2   necessarily a document.  I mean, it's information.

3   That's just as much of a piece of evidence obtained that

4   could have lead them to learn something.

5        So my best answer to the Court is it

6   is -- it is if there is no evidence that came from those

7   devices, the Court then does have to go to were the

8   devices lawfully taken in the first place.

9        That again is the full stop for me.

10       After that, in terms of the motion to

11  suppress --

12       THE COURT:  Well, I guess -- I guess from

13  the motion to suppress standpoint, let's assume for the

14  sake of argument that the devices were unlawfully seized,

15  in fact you can even assume that they were unlawfully

16  searched as well, if the Government is not seeking to use

17  any information from that and we have proper assurance of

18  that, I mean why, why is there a motion that I need to

19  decide?

20       MR. ROSEN:  If -- my question back to me,

21  what is a proper assurance?  Okay.  That's, to me, the

22  question.

23       And if a document has not been turned over

24  to me that came from that device, my response back would

25  be is that enough.  Because if there's information that

1    was obtained, again, for example, how do we know if an

2    agent associated with this case has looked at something

3    and how do we know that that information didn't allow

4    them to ask a witness a question?

5                    That's the same thing.  It isn't just a

6    document.

7                    So I don't know how -- I mean, I understand

8    the Court's question.  I mean, it's plainly apparent.

9                    But how do we determine, unless we hear

10   testimony, who has accessed it, who hasn't seen it?

11                   I mean, if Agent Fry takes the stand and

12   says, "Listen, there was a Chinese wall set up and

13   everybody associated with this case has not had one iota

14   of viewing of it," all right, fine.

15                   I mean, that's the adversarial process at

16   issue, right?

17                   Then we move on to the next motion which is

18   return of the evidence.

19                   But I need to know that.  I need to know

20   that nobody associated with this case has looked at it;

21   who the agents were that did look at it.  I mean, I think

22   we need to know what happened to it.

23                   And then I think the question is, that's

24   suited to the Court, okay, now I've heard and I can

25   determine that the motion is unnecessary because it has

1    not impacted this case whatsoever.

2              But I don't think the fact that -- a

3    document alone is not going to resolve it.  It is the

4    issue and the information and what was done with that.

13:30:19  5        And the only way to determine that is by

6    finding out who has accessed it and what's happened with

7    it.

8              Then I think the Court's question becomes a

9    more appropriate one.

13:30:29  10       THE COURT:  In terms of returning the

11   property, then what's the right venue for that?

12             My understanding of the law, I'll tell you

13   I spent a couple days on this a few years ago.  The law

14   was not real clear, I'll confess, but my best read of it

13:30:47  15  was that motions for return of property are separate

16   civil actions that are best brought where the property

17   is.

18             It's kind of a *quasi in rem* proceeding, if

19   you will.

13:31:00  20       MR. ROSEN:  There's actually a criminal

21   rule, I think I cited to, which does state -- let me see

22   if I can get the Court the rule.

23             THE COURT:  Is it 41(g)?

24             MR. ROSEN:  I think (g).

13:31:10  25       THE COURT:  And motion filed in the

1    district --

2                    MR. ROSEN:  Yes.

3                    THE COURT:  -- where the property was

4    seized.

13:31:12   5            So --

6                    MR. ROSEN:  And it says -- okay.  And

7    again, you know, not to include conversations that we

8    had, but I felt -- and I did think about it before I said

9    it -- that it was agreed to and appropriate that if we

13:31:28  10   filed this motion, that the Government had agreed that it

11   would be appropriate to have it here because it's all

12   connected to this one case.

13                    So if they're withdrawing that, then

14   they're withdrawing that.

13:31:43  15                    THE COURT:  You don't want to make a trip

16   to the Virgin Islands?

17                    MR. ROSEN:  Virgin Islands?  As long as

18   there's no outstanding warrant for my arrest, I'm good to

19   go.

13:31:52  20            So anyway, Judge, the issue is, as I spoke

21   to you about the motion to suppress.

22                    And then if we reach that motion for

23   return, I think the Court has the authority to conduct a

24   hearing here, and I think it would be appropriate to do

13:32:09  25   so.

1           THE COURT:  All right.  Thank you.

2           MR. ROSEN:  Sure.

3           THE COURT:  Mr. Abreu.

4           MR. ABREU:  Thank you, Your Honor.

13:32:16  5           Just briefly.

6           There's no legitimate basis for this

7      motion.  There's no evidence to suppress.

8           Mr. Rosen is asking for relief that the

9      Court can't grant.  There's no evidence being introduced.

13:32:33  10          You know, at the beginning of his statement

11     "Mr. Abreu's word is good enough," and then, "No, now we

12     need a hearing so I can ask questions of every agent

13     about things that don't pertain to this case."

14          There's a reason the Rules are set up the

13:32:49  15     way they're set up, and suppression motions require

16     evidence that's supposed to be introduced.

17          If there's -- if there are materials that

18     the Government needs to turn over, according to Rule 16

19     it will do that when it has it.  And so that's -- that is

13:33:13  20     the reason that we argued that the motion is moot.

21          We indicated such at the last pretrial.

22     And I will talk about the conversations I had with

23     Mr. Rosen because he's an officer of the Court and I took

24     his word for it when he said if you just, you know, put

13:33:28  25     it in writing that you guys haven't looked at the phones,

1    I'll dismiss the motion.

2                Okay.  So we did that.  We haven't looked

3    at the user data.

4                You know, Mr. Rosen wants a criminal

13:33:43  5    justice system that answers to him about every

6    investigation that the Government has.  He's looking for

7    an answer to a question he knows, because he told the

8    Court that we've subpoenaed Apple iCloud accounts and

9    we've subpoenaed other information.

13:33:59 10                And if subpoenas were issued and they

11    weren't trial subpoenas, it's a grand jury subpoena, it's

12    likely there's another investigation.

13                That's not a secret because I told

14    Mr. Rosen that the last time we talked.

13:34:12 15                So there's -- and he knows what the

16    investigation is about because it's conduct that his

17    client brought to us and said, "Well, I wasn't doing

18    anything wrong," and he lied about it.

19                And that's why we stopped negotiating with

13:34:32 20    him, because he would not be a credible witness even if

21    we did what he wanted to do and gave him a -- gave him a

22    pass and didn't charge him.  He was lying to us then.

23                He knows the conduct that he's engaged in,

24    but it's a separate matter.  It's not before this Court.

13:34:54 25                If he wants the return of property, you

1     know, I guess that is what I took issue with is, you

2     know, on one hand, you know, not -- we try to be cordial

3     in this business, especially amongst lawyers, and I know

4     that's important to the Court, but what's particularly

13:35:14  5     frustrating is this kind of scenario where then it

6     becomes, you know, at this point everything has to be in

7     writing.

8                     And, you know, I don't like for things to

9     devolve to this level, but, you know, this motion to

13:35:34 10     dismiss or, I'm sorry, the motion to suppress, you know,

11     isn't proper here.

12                     And the motion to return property isn't

13     properly venued here.  And even if it were, he would need

14     to file a new civil action to have the property returned.

13:35:53 15                     And then, you know, that Court, even if it

16     was related and it came back to Your Honor, we'd have to

17     talk about what the reasons were that it was seized and

18     go from there.

19                     But it has nothing to do with this case.

13:36:08 20     It has nothing to do with these other defendants.  And so

21     the motion should be denied.

22                     THE COURT:  All right.  Thank you.

23                     As best I can tell, that's all of the

24     pending matters.

13:36:36 25                     So I have additional work to do.  I do

1    appreciate your arguments that are helping focus me and

2    clarify some of the issues and things I need to be

3    working on.

4           So thank you, all, for that.

13:36:50 5           I will get you a ruling as promptly as we

6    can.

7           I know we have a schedule pending.  I'm not

8    sure offhand what our next date is, but I'll get you a

9    ruling promptly, and we will move the case forward,

13:37:05 10    assuming there's counts that are not dismissed.

11           And if there are, we'll figure out what the

12    schedule looks like, what the case looks like after the

13    ruling.

14           So thank you, everyone.

13:37:17 15           Are there other matters we should address

16    before we adjourn for the day?

17           Mr. Abreu for the United States, anything

18    on your agenda?

19           MR. ABREU:  Your Honor, just a procedural

13:37:27 20    issue.

21           How does the Court -- I've had different

22    experiences in different courtrooms with respect to bond

23    violations.

24           Do you -- does the Court prefer motions

13:37:38 25    being filed with the Court, or that information being

146

1    passed to Pretrial and receiving the information that

2    way?

3              THE COURT:  Well, I think that I'm aware of

4    one report that came back from Pretrial, and I was going

13:37:51 5    to take that up today, but immediately after we adjourn

6    this proceeding with the appropriate counsel.

7              So don't go anywhere.

8              MR. ABREU:  Okay.  But that wasn't -- it

9    wasn't anything specific.

13:38:01 10              It was just a --

11              THE COURT:  In general.

12              MR. ABREU:  In general.

13              THE COURT:  I generally get reports from

14    the Probation Office or Pretrial Services in this case.

13:38:08 15              MR. ABREU:  Okay.  Thank you, Judge.

16              THE COURT:  Anything else on the defense

17    side?

18              MR. AXELROD:  Nothing, Your Honor.

19              THE COURT:  All right.

13:38:15 20              MR. McCAFFREY:  No, Your Honor.

21              MR. DeVILLERS:  No, Your Honor.

22              THE COURT:  All right.  Well, we are

23    adjourned.

24              Why don't we take a short break, and then

13:38:23 25    we'll reconvene on the separate matter?

1                    Those of you who aren't affected are free

2        to go.

3                    Thank you.

4                    THE CLERK:  All rise.

13:38:32  5          (Proceedings concluded at 1:38 p.m.)

6                       -  -  -  -

7               C E R T I F I C A T E

8                    I certify that the foregoing is a correct

9        transcript from the record of proceedings in the

10       above-entitled matter.

11

12

13

14       **/s/Susan Trischan**
         /S/ Susan Trischan, Official Court Reporter
15       Certified Realtime Reporter

16       7-189 U.S. Court House
         801 West Superior Avenue
17       Cleveland, Ohio 44113
         (216) 357-7087
18

19

20

21

22

23

24

25